**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WILLIAMS ENTERPRISES, INCORPORATED, a Division of Williams Industries, Incorporated, Respondent.**

No. 94–1294.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1994.

Decided April 6, 1995.

**ARGUED:** Frederick Lee Cornnell, Jr., N.L.R.B., Washington, DC, for petitioner. Lawrence Theodore Zimmerman, Sanders, Schnabel, Brandenburg & Zimmerman, P.C., Washington, DC, for respondent. **ON BRIEF:** Frederick L. Feinstein, Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Margaret Gaines Neigus, Supervisory Atty., N.L.R.B., Washington, DC, for petitioner. Paul O. Jolis, Sanders, Schnabel, Brandenburg & Zimmerman, P.C., Washington, DC, for respondent.

Before HALL and WILLIAMS, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

## OPINION

PHILLIPS, Senior Circuit Judge:

The National Labor Relations Board ("the Board") petitions for enforcement of its affirmative order that Williams Enterprises, Inc. ("Williams") recognize and bargain with Local Lodge 10 of the International Association of Machinists and Aerospace Workers, AFL–CIO ("the Union"). Williams challenges critical Board findings upon which liability was determined and also challenges the propriety of a bargaining order as remedy for the violations found. Finding no merit to these challenges, we enforce the Board's order.

### I

Williams owns and operates a steel fabricating business in Richmond, Virginia, that engages primarily in steel bridge construction. Earlier, Bristol Steel and Iron Works, Inc. ("Bristol") had owned and operated the facility now owned by Williams, fabricating steel primarily for use in building construction. Pursuant to a buy-sell agreement, Williams purchased Bristol's tangible assets in 1987. At the time of the agreement, Bristol employed 83 production employees who were represented by the Union.

Pursuant to the purchase agreement, all work at the Bristol plant was scheduled to shut down on September 30, 1987, and all Bristol employees were to be terminated at that time. On July 14, 1987, the plant manager for Bristol, John Barnes, and the plant superintendent, James Johnson, called a meeting of all Bristol employees to inform them of this plan. Barnes and Johnson told the employees that they were invited to fill out applications for jobs with Williams but that none of them would automatically be hired. All 83 Bristol employees applied.

Shortly after the July 14 meeting announcing the shut down, the Union's business agent, Stephen Spain, called Barnes and said he "would like for Local 10 to represent the employees of the new company." He also asked Barnes to tell a Williams official that he wanted "to have an opportunity to discuss, perhaps negotiate with" the official. Later in September, Barnes forwarded this message to Richard Geyer, the new Williams facility manager, but neither Barnes nor Geyer responded to Spain's suggestion.

On August 21, 1987, Barnes and Johnson again met with Bristol employees but this time they held two separate meetings—one with 44 employees designated "favored for employment" and one with the remaining "unfavored" employees. At the meeting with the favored employees, an employee asked whether Williams's new employees would be represented by a union. Johnson responded that Williams "did intend to operate the Richmond plant as a non-union plant." This answer was not mere conjecture: Barnes later testified that he knew it to be true because Williams officials had instructed him to convey that message to the Bristol employees; Johnson actually carried out the instruction.

Spain continued to represent the Bristol employees' interests. He negotiated a shutdown agreement with Bristol that secured severance pay, vacation pay, and temporary insurance coverage for the Bristol employees. He met with the employees in September to review the terms of that agreement. He also passed out union authorization cards to the employees; the record does not indicate how many employees signed the cards or to what use the Union put the signed cards.

On September 30, Bristol ceased operating as planned, and Williams began operations the next day. On that day, Williams hired 17 former Bristol employees to start up its operations, and it hired Barnes and Johnson to continue as plant manager and superintendent. Williams later hired more former Bristol employees, and by November 30, 1987, Williams had drawn 36 of its 40 new employees from the list of 44 favored Bristol employees.

By December 1987, Spain still had not received a response to his suggestion that he and a Williams official meet to discuss representation of the Williams employees. Consequently, on December 14, the Union filed a charge with the Board alleging violations of the National Labor Relations Act ("NLRA"). Barnes called an employee meeting to discuss the Union's allegations on December 28, 1987. During the meeting, an employee said that he opposed union representation and asked Barnes what he and other employees sharing his view could do to prevent unionization of the plant. Barnes explained that the employees could draw up a petition expressing their views but cautioned that any effort to do so would have to be done on the employees' own time. Barnes also stated that Williams would be "glad" to receive a petition as a "defense" to the charges. Barnes was delivered a petition on December 31, 1987, signed by 23 of the 35 current production employees of Williams stating that they did not wish to be represented by the Union.

On January 25, 1988, for unknown reasons, the Union withdrew its charge with the Board. By letter dated February 2, it renewed its demand for recognition from Williams. Then, two days later, the Union refiled its charges. Williams rejected the Union's second request for bargaining by a letter dated February 16, asserting that the anti-union petition signed by a majority of its production employees in December created a good faith doubt as to the Union's majority status and thereby relieved it of the duty to bargain.

On August 9, 1988, based on the above facts, the Board issued a complaint against Williams alleging that Williams had a duty to bargain with the Union as a successor employer and that its refusal to do so violated the NLRA. The complaint also alleged that Williams violated the NLRA by telling employees that it would not have a union at the new plant.[1]

An Administrative Law Judge found that Williams was a successor company to Bristol, that, as such, it had a duty to bargain with the Union because it was an incumbent union,[2] and that its failure to bargain constituted a violation of the NLRA. *Williams Enters., Inc.*, 5–CA–19408, slip op. at 8, 11 (May 22, 1989) (hereinafter ALJ Opinion). The ALJ concluded that the duty to bargain arose after Spain's telephone conversation with Barnes; although made before Williams succeeded Bristol, this conversation constituted a demand that continued until approximately October 15, 1987, by which time Williams had hired a substantial and representative complement of its work force, the majority of whom had been employed by Bristol and presumably supported the Union. The ALJ further found that this original demand was reaffirmed by the Union's filing of refusal-to-bargain charges in December 1987 and again by the Union's letter in February 1988 which renewed the demand for recognition. Because the ALJ then found that Johnson's statement at the August 21, 1987 meeting that Williams intended to operate non-union violated the NLRA and tainted the petition signed by the employees, the ALJ rejected Williams's contention that it had a good faith doubt about the Union's majority status when it refused to bargain. Finally, the ALJ found that Barnes did not violate the NLRA by discussing a decertification petition at the December 28 meeting of employees. Based on these findings and conclusions, the ALJ recommended ordering Williams to cease and desist all NLRA violations including the refusal to recognize and bargain with the Union.

The Board affirmed the ALJ's decision, but modified the rationale for the conclusion that the petition was tainted and could not therefore excuse Williams's refusal to bargain. As additional support for that conclusion, the Board relied not only on Barnes's August 21, 1987 statement, as the ALJ had done, but also on Williams's refusal to bargain during the months before the petition was circulated. *Williams Enters., Inc.*, 301 N.L.R.B. 167, 170, 1991 WL 12489 (1991). The Board adopted the recommended order, modifying it by affirmatively ordering Williams to recognize and, on request, bargain with the Union.

The United States Court of Appeals for the D.C. Circuit enforced the Board's decision in part, agreeing that Williams had a duty as a successor company to recognize and, on demand, bargain with the Union and that Johnson's August 21, 1987 statements violated the NLRA by conveying to potential employees the implicit message that any pro-union conduct could jeopardize their employment opportunities. *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226 (D.C.Cir.1992). However, the court rejected the Board's conclusion that Spain's July 1987 telephone conversation with Barnes constituted a valid request for bargaining that created a duty for Williams to bargain as of October 15. The court was satisfied that the Union's letter of February 2, 1988 was a valid bargaining demand, but it remanded the case to the Board for determination of when the duty to bargain *first* arose (i.e., whether the February 2 letter was the first valid bargaining demand or whether one had occurred earlier). It also remanded the case for determination of whether and how the employee petition delivered to Barnes in December 1987 was tainted. In particular, it directed the Board to explain the causal relation between any NLRA violation and the petition (i.e., why

---

1. Other violations that were alleged by the NLRB, established during the initial hearing, and affirmed by the Board are not relevant to this petition for review. They include unlawful refusal to hire two employees who were on the favored list because of their pro-union activities and unlawfully telling another potential employee that it did not want a union at the plant and considering his stance on unionization in its hiring decision.

2. An incumbent union is a union that enjoyed the status of a 9(a) collective-bargaining representative with a predecessor company.

Johnson's unlawful announcement on August 21, 1987 "would linger in the minds of Williams's employees for four months and undermine the Union's support when the petition circulated in December." *Id.*, 956 F.2d at 1235). Finally, because an affirmative bargaining order infringes employees' right to reject union representation by barring union decertification via employee petition for a reasonable period of time, the court directed the Board to justify entering an affirmative bargaining order rather than a less drastic remedy that would not have entailed a decertification bar.

On remand, the Board issued a Supplemental Decision and Order. *Williams Enters., Inc.*, 312 N.L.R.B. 937, 1993 WL 402910 (1993). It concluded, on alternative grounds, that Williams had unlawfully refused to bargain with the Union. First, it found that the Union's initial filing of an unfair labor practice charge on December 14, 1987 either served as a valid demand standing alone or at least clarified Spain's prior inadequate request in July, thereby removing any doubt that the Union was demanding recognition. It held that Williams therefore had a duty to bargain as of December 14, 1987, which it ignored, and, because the only possible justification for refusing to bargain, the employee petition, did not exist until two weeks later, Williams's refusal was unjustified and unlawful.

Alternatively, the Board reiterated that, even if the Union's filing of charges did not suffice as a valid demand, the Union made a valid bargaining demand via the letter from Spain to Barnes on February 2, 1988, which explicitly requested recognition. The Board then reaffirmed its original finding that the petition did not excuse Williams's February refusal to bargain. It found that the petition was tainted by Johnson's unlawful anti-union announcement in August. In addition, it explained that, while Barnes's statements regarding the petition at the December meeting (four months after Johnson's statements) did not themselves violate the NLRA, they reminded the employees of Johnson's prior violation and thereby reinforced its tendency to cause employee disaffection with the Union. Finally, the Board reaffirmed its choice of remedy, explaining that an affirmative bargaining order is the appropriate and traditional means "to restore to the [incumbent] Union the bargaining opportunity it should have had in the absence of unlawful conduct" and that a mere remedial order is more appropriate for non-incumbent unions.

The Board now seeks enforcement of its order. Williams challenges the findings that it had a duty to bargain with the Union as of December, that the employee petition was tainted by Johnson's statements, and that the petition therefore could not justify the February refusal to bargain. Williams also challenges the propriety of the affirmative bargaining order.

## II

■ We first consider Williams challenge to the Board's finding that it had a duty to bargain arising as early as December 14, 1987. "The successor's duty to bargain ... is triggered only when the [incumbent] union has made a bargaining demand." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 52, 107 S.Ct. 2225, 2241, 96 L.Ed.2d 22 (1987). As indicated in our statement of the case, the Board concluded that the Union's filing of unfair labor practice charges against Williams on December 14, 1987, constituted a valid bargaining demand. We need not decide whether such charges, standing alone, can suffice to constitute a valid bargaining demand, for we are satisfied that the filing of the charges, viewed in light of Spain's previous inadequate request, did qualify as a valid bargaining demand. "A valid request to bargain need not be made in any particular form, or *in haec verba*, so long as the request clearly indicates a desire to negotiate and bargain on behalf of the employees." *Stanford Realty Assocs. v. NLRB*, 306 N.L.R.B. 1061, 1066, 1992 WL 75105 (1992). The charges did indeed clearly indicate the Union's desire to negotiate and bargain.

Other courts have held that the filing of such charges can constitute a valid demand, but only where the charges confirm a union's earlier expression of a desire to be recognized as the collective bargaining representative. For instance, in *Fall River*, the Su-

preme Court held that an incumbent union "made clear" its belief that a successor company was obliged to bargain when it "filed an unfair labor practice charge" alleging an unlawful refusal to bargain. 482 U.S. at 53, 107 S.Ct. at 2241. The union had previously made a premature, but explicit, bargaining demand. Thus, it was only in conjunction with the previous inadequate request that the charges constituted a valid demand. In *Fall River*, the successor company had not yet hired a substantial and representative component of its work force at the time of the filing of the charges. The Court held that the validity of the demand nevertheless continued and the duty to bargain arose when the company hired a substantial and representative complement of its work force.

■ In the present case, it is uncontested that Williams had hired a substantial and representative complement of its work force by approximately October 15. Thus, all the criteria for Williams's duty to bargain were present by December 14: Williams had hired its work force and the Union had made an unequivocal expression of its desire to be the collective bargaining representative by filing charges which, viewed in light of the previous but inadequate demand made by Spain in July, made it unmistakably clear that the Union wished to bargain. Therefore, Williams was obliged to recognize the Union and bargain with it as of the date of the filing of the refusal-to-bargain charges.[3]

In *Fall River*, the former expression of the union's desire to be recognized and to bargain was premature but otherwise valid, whereas in the present case, the former expression was somewhat vague and was not a valid demand by itself. There is, however, a line of Board cases which we find persuasive in which similarly vague prior expressions have been held to be sufficient to justify treating a later filing of charges as a valid

demand. *See Stanford Realty Assocs.*, 306 N.L.R.B. at 1066 (a refusal-to-bargain charge "demonstrate[d] and clarifie[d]" a union's previous request for recognition which was implicit in its demands that the company execute contracts and provide medical benefits); *Sterling Processing Corp. v. Local 424*, 291 N.L.R.B. 208, 210–11, 217, 1988 WL 214136 (1988) (holding that a "refusal-to-bargain charge ... was itself tantamount to a valid request for recognition under established Board policy," in case in which incumbent union had previously demanded that company adhere to a preexisting contract); *Sewanee Coal Operators Assn.*, 167 N.L.R.B. 172, 172 n. 3 (1967) (filing of refusal-to-bargain charge served as a "renewal of the Union's request to bargain"); *Roberts Elec. Co.*, 227 N.L.R.B. 1312, 1319, 1977 WL 8264 (1977) (same).

■ Accordingly, we affirm the Board's conclusion that the December 14, 1987, filing of charges, viewed in light of Spain's earlier July request for negotiation, constituted a valid bargaining demand. Consequently, the later-submitted employee petition rejecting union representation cannot serve retroactively to justify Williams's refusal to bargain in response to the Union demand.

### III

We next consider the alternative possibility that, even if the Union's filing of charges had not created a duty to bargain as of December 14, 1987, its indisputedly adequate bargaining demand by letter on February 2, 1988, gave rise to such a duty and that Williams's refusal then to bargain was a violation of the Act. We agree with the Board's conclusion that the refusal was not justified, and hence was a violation.

---

**3.** Williams contends that the charges cannot now be considered as a demand because they were not so considered in the original NLRB proceeding. We disagree. The ALJ found in its initial hearing, and the Board affirmed, that the charges "served to reaffirm the Union's claim to be the bargaining representative." ALJ Opinion at 10; 301 N.L.R.B. at 167.

In addition, Williams contends that the D.C. Circuit opinion precludes consideration of the charges as a demand. However, the D.C. Circuit

merely held that the July conversation was not a sufficient demand and remanded for a determination of when the duty to bargain first arose. The court did not address the finding regarding the charges, and so the Board was not precluded from considering the charge on remand. *See Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1157 n. 18, 59 L.Ed.2d 358 (1979) (matters left open by appellate court may be considered on remand).

An incumbent union enjoys a presumption that it is supported by a majority of the employees of the successor company, and a successor company generally may not lawfully refuse a valid request that it recognize and bargain with the incumbent union. *Fall River,* 482 U.S. at 37–38, 107 S.Ct. at 2232–33. The presumption is conclusive for the first twelve months after certification of the union, and rebuttable thereafter by the successor company with a showing that the incumbent union has lost its majority status or that refusal to bargain is "grounded on a good-faith doubt based on objective factors that the union continue[s] to command majority support." *Id.,* 482 U.S. at 37–38, 41 n. 8, 107 S.Ct. at 2232–33, 2235 n. 8 (quoting *Harley–Davidson Transp. Co.,* 273 N.L.R.B. 1531, 1985 WL 45975 (1985)); *accord Terrell Machine Co. v. NLRB,* 427 F.2d 1088, 1090 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

Williams contends that it made such a showing in that the employee petition rejecting Union representation created a good faith doubt in the Union's majority status. However, a company may not avoid the duty to bargain by a loss of majority status caused by its own unfair labor practices unless it can show that "the unfair labor practices did not significantly contribute to such a loss of a majority or to the factors upon which a doubt of such a majority is based." *NLRB v. Nu–Southern Dyeing & Finishing, Inc.,* 444 F.2d 11, 15–16 (4th Cir. 1971). Here, as indicated, the Board in its supplemental decision concluded that the decertification petition "was tainted by antecedent unlawful conduct," namely, Johnson's August remarks. 312 N.L.R.B. at 939. We agree.

The Board has identified certain factors helpful to the determination whether a causal relationship exists between unremedied unfair labor practices and the subsequent expression of employee disaffection with an incumbent union. They are:

(1) The length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

*Master Slack Corp.,* 271 N.L.R.B. 78, 84, 1984 WL 36573 (1984). The Board made detailed findings that each of these four factors were met—that the employee rejection of the Union occurred within a reasonable time of the Johnson statements, that the nature of Johnson's statements was such that they would make a lasting impression and cause the reasonable employee to abandon the Union, and that the statements, along with other actions by Williams, apparently caused employee disaffection with the Union where there had been none before, thereby negatively impacting employee morale and the prospect of Union support. 312 N.L.R.B. at 939–40. We cannot say that these findings were not supported by substantial evidence on the record as a whole.

The lapse of four months between Johnson's August statements and the petition raises the most serious problem. However, the statements indisputedly violated the NLRA, and, despite the fact that four months passed between the Johnson remarks and the petition signing, the lag did not necessarily dissipate the coercive effects of the remarks. Because they were made at a formal meeting of prospective employees who were naturally concerned about securing employment, the statements assuredly were calculated to make and did make upon their hearers an impression of the need to suppress any prounion sentiments they might harbor in order to increase their job security. Threats of "loss of employment" are assumed to be "highly coercive," "to remain in [employee's] memories for a long period," and to have "a lasting inhibitive effect on a substantial percentage of the work force." *NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 212–13 (2d Cir.1980); *accord NLRB v. So–Lo Foods, Inc.,* 985 F.2d 123, 126–27 (4th Cir.1992). Especially at a time as "unsettling" as transition between employers, employees "will be concerned primarily" with keeping their jobs and "might be inclined to shun support for their former union, especially if they believe

that such support will jeopardize their jobs with the successor." *Fall River*, 482 U.S. at 39–40, 107 S.Ct. at 2233–34. Specifically, where a new employer does not yet "know whether it will have a duty to . . . bargain with the predecessor's union because it does not know whether it will hire a majority of the predecessor's employees," anti-union sentiments, such as those expressed by Johnson in the present case, indicate "to the applicants that [the employer] intends to discriminate against the [predecessor's] employees to ensure its nonunion status." *Williams Enters., Inc.*, 956 F.2d at 1234 (discussing and quoting *Kessel Food Markets, Inc.*, 287 N.L.R.B. 426, 429, 1987 WL 90101 (1987), *enf'd*, 868 F.2d 881 (6th Cir.1989)).

Any dissipation over time of the coercive effect of Johnson's statements was counteracted by the continuing nature of the anti-union message from the company. The employees were repeatedly reminded of Williams's desire to operate non-union by Barnes's statements to the group in December, by the refusal of Williams to bargain with the Union, by the charges against Williams, and by the obvious importance of union sentiment in the hiring decisions of several employees which was the subject of other charges made but not now in the case.[4] Substantial evidence on the record as a whole supports the conclusion that Williams's actions significantly contributed to the employees becoming disaffected with the Union and that the petition was therefore tainted. Accordingly, we affirm the Board's findings that there was a causal nexus between Williams's coercive actions and the eventual employee rejection of the Union, sufficient to taint the petition and prevent it from justifying Williams's otherwise unlawful rejection of the Union's February bargaining request.

## IV

The Board has broad discretion to choose a remedy. We must enforce its choice "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA]." *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); *Overnite Transp. Co. v. NLRB*, 372 F.2d 765, 770 (4th Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967). Williams made no such showing, and we therefore cannot find abuse of discretion in the Board's choice of remedy here.

In the present case, the Board justified its choice of remedy by pointing out that, "[f]or over 50 years, an affirmative bargaining order has been the standard Board remedy for an employer's unlawful refusal to bargain with [an incumbent] union." 312 N.L.R.B. at 940. *See Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704–05, 64 S.Ct. 817, 818–19, 88 L.Ed. 1020 (1944); *NLRB v. P. Lorillard Co.*, 314 U.S. 512, 512–13, 62 S.Ct. 397, 397–98, 86 L.Ed. 380 (1942).

The distinction between incumbent unions and non-incumbent unions is significant. An incumbent union enjoys a presumption of majority status which burdens the successor company with an obligation to recognize it and bargain with it. Thus, when a successor company refuses to recognize or bargain with an incumbent union, only an affirmative bargaining order can restore the status quo ante—that is, reseat the union as the incumbent and restore to it the bargaining opportunity it would have had but for the successor's unlawful refusal to bargain. *Frank Bros.*, 321 U.S. at 705, 64 S.Ct. at 819; *Ron Tirapelli Ford, Inc. v. NLRB*, 987 F.2d 433, 445 (7th Cir.1993) ("a bargaining order is the appropriate remedy to return the parties to the status quo ante"). In contrast, a non-incumbent union never enjoyed a presumption of majority status; therefore, an affirmative order to bargain with a nonincumbent union grants it a better position than the status quo—initial recognition as the bargaining agent which it would not have had even before the company's unlawful conduct.

As the Court of Appeals for the D.C. Circuit explained in the present case, "[o]ne of the fundamental rights under the [NLRA] which the Board is charged with protecting is employees' right to choose their

---

**4.** *See supra* note 1.

collective bargaining representative, as well as the 'right to refrain' from collective bargaining." 956 F.2d at 1237 (quoting *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 45 (D.C.Cir.1980)). An affirmative bargaining order of course infringes upon this right and restricts employees' freedom of choice by requiring that the employer bargain in good faith "for a reasonable period" of time, thereby precluding a decertification election by the employees during that reasonable period. *Franks Bros. Co.*, 321 U.S. at 705, 64 S.Ct. at 819. Such a restriction does not, however, render the remedy inappropriate. It does not fix a permanent bargaining relationship between the employer and the union, but only restores the status quo, putting the parties back in the position in which they would have been but for the initial wrongful refusal to bargain. Had Williams not engaged in unfair labor practices in 1987 and 1988, it would have bargained with the Union then and might have bound the employees to a contract they did not want even then. After a reasonable period, the employees will be free to reject the union, if they so choose, free of the former taint. *Id.*, 321 U.S. at 705–06, 64 S.Ct. at 819. Thus, the employees are in no worse position, and are probably in a better position, than they were at the time of the initial refusal to bargain.

■ The reasonable period generally lasts until an agreement is reached or a genuine impasse in negotiations occurs. In similar cases, this period has been found to have lasted no more than one year. *E.g., NLRB v. Aquabrom*, 855 F.2d 1174 (6th Cir. 1988) (one year from date when employer commences to bargain in good faith); *Mammoth of Cal., Inc. v. NLRB*, 673 F.2d 1091, 1094 (9th Cir.1982) (four months); *Tennessee Prods. & Chem. Corp. v. NLRB*, 423 F.2d 169, 175 (6th Cir.) (one year), *cert. denied sub nom. UMW v. Tennessee Prods. & Chem. Corp.*, 400 U.S. 822, 91 S.Ct. 42, 27 L.Ed.2d 50 (1970); *Gerrino, Inc. v. Hotel Employees & Rest. Employees Union*, 306 N.L.R.B. 86, 1992 WL 19888 (1992) ("at least six months"); *Brennan's Cadillac, Inc.*, 231 N.L.R.B. 225, 1977 WL 8965 (1977) (four months); *Tajon, Inc.*, 269 N.L.R.B. 327, 1984 WL 36183 (1984) (three months). *See also Exxel/Atmos, Inc. v. NLRB*, 37 F.3d 1538,

1539–40 (D.C.Cir.1994) (per curiam) (Silberman, J., dissenting) (arguing that reasonable time need not be limited to the period remaining in the first year after union certification when the unfair labor practice was committed because a specified period encourages employer to wait out the period rather than reach an agreement). Thus, the limit on employees' freedom of choice, while not inconsequential, is relatively minor compared to the potential harm from a premature decertification election.

■ In contrast, a lesser remedial order might allow an election to take place while the effect of the unlawful refusal to bargain still lingered. As the Supreme Court has noted, an employer's unlawful refusal to bargain "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co.*, 321 U.S. at 704, 64 S.Ct. at 818. These effects in turn could prevent an election from reflecting "the employees' true, undistorted desires." *Bishop v. NLRB*, 502 F.2d 1024, 1028 (5th Cir.1974). The Board is entitled to take into account the risks that allowing a decertification election to occur in those circumstances could permit an employer to profit from its own wrongdoing and might even encourage other "recalcitrant employers ... to postpone performance of their statutory obligation" to bargain on the chance that this might eventually result in a vote against collective bargaining. *Franks Bros.*, 321 U.S. at 705, 64 S.Ct. at 819. For these reasons, the Board properly selected the affirmative bargaining order as the remedy best calculated to cure the effects of the employer's unlawful conduct and to deter its future misconduct. We therefore will enforce the order.

*SO ORDERED.*