Cornele A. OVERSTREET, Regional Director for the Twenty-eighth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**TUCSON READY MIX, INC., Respondent.**

No. CIV 98–180 TUC ACM.

United States District Court, D. Arizona.

May 21, 1998.

Arthur Tracy Carter, Haynes & Boone, LLP, Dallas, TX, for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND TEMPORARY INJUNCTION

MARQUEZ, Senior District Judge.

The Regional Director of the National Labor Relations Board (NLRB) seeks a temporary injunction pursuant to § 10(j) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(j), pending disposition of the labor relations matter currently before the Board. The merits of an unfair labor practice charge are determined by the NLRB and subject to review by the court of appeals. Administrative review can, however, be slow; therefore, Congress provided in § 10(j) of the Act that the NLRB may, as it does here, petition a district court to enjoin alleged unfair practices pending Board review of the substantive evidence of those practices. *Calatrello v. Automatic Sprinkler Corp. of America*, 55 F.3d 208, 212 (6th Cir.1995).

Respondent, Tucson Ready Mix, purchased Tucson Rock & Sand, Inc. (TR & S), whose employees were represented by respective unions: Operating Engineers Union, Local 428 (Operators Union), and the Teamsters Union, Local 104 (Teamsters Union).[1] The Operators Union was designated as the exclusive collective-bargaining representative of the Operating Engineers Unit at TR & S, and its representative status was voluntarily recognized by TR & S. Recognition of the Operators Union was embodied in successive collective-bargaining agreements, the most recent of which was effective by its terms from May 9, 1995, to November 30, 1998. The Teamsters Union was designated as the exclusive collective-bargaining representative of the Teamsters Unit at TR & S, and its representative status was voluntarily recognized by TR & S. Recognition of the Teamsters Union was embodied in successive collective-bargaining agreements, the most recent of which was effective by its terms from August 21, 1995, to November 30, 1997.[2]

Paul R. Irving, Michael J. Karlson, National Labor Relations Board, Phoenix, AZ, for Petitioner.

1. The two are referred to herein, collectively, as "Unions."

2. The parties stipulate that the Unions have represented the respective bargaining units since 1946.

This action involves unfair labor practice charges filed with the NLRB by the Unions alleging that after the purchase of TR & S, Respondent, a successor employer,[3] initially refused to recognize the Unions as the exclusive collective-bargaining representatives of Respondent's employees and, thereafter, after briefly extending recognition of the Unions but without bargaining, withdrew recognition from the Unions. Since Respondent withdrew recognition from the Unions, Respondent has failed to recognize and bargain with the Unions as the exclusive collective-bargaining representatives of Respondent's employees. (Petitioner's Memorandum of Points and Authorities in Support of Petition (P's Memo.) at 2.)

Petitioner asks this Court to order Respondents to recognize and bargain with the Unions; enjoin Respondent from making unilateral changes in employees' terms and conditions of employment; from interfering with, restraining, or coercing employees in the exercise of their collective-bargaining rights, and post copies of the Court's decision. (Petition at 9–10.) The Petitioner does *not* seek reinstatement of the terms and conditions of the collective bargaining agreements in place prior to Tucson Ready Mix's purchase of TR & S, which would include lower wages which Respondent unilaterally increased.

**3.** The new employer has an obligation to bargain with the union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor. *Fall River Dyeing & Finishing v. NLRB,* 482 U.S. 27, 41, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). In *Burn's,* the Supreme Court approved an approach for determining whether a new company is a successor to the old, *id,* at 42–43, 107 S.Ct. 2225 (citing *N.L.R.B. v. Burns International Security Services, Inc.,* 406 U.S. at 280–281 n. 4, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), which is primarily factual in nature and is based upon the totality of the circumstances of a given situation. The Court must focus on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Id.* (citing *Golden State Bottling Co. v. N.L.R.B.,* 414 U.S. 168, 184, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973)). The focus is on whether there is "substantial continuity" between the enterprises. *Id.* at 43, 107 S.Ct. 2225, 96 L.Ed.2d 22. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of

*A.*

### STANDARD FOR RELIEF UNDER 29 U.S.C. § 10(j)

 This proceeding is ancillary to the NLRB's administrative proceeding. The principal issue before a district court in this type of proceeding is not the determination of the merits of the underlying case, but rather is whether Petitioner's request for temporary injunctive relief is just and proper. In making this determination, the Ninth Circuit has admonished the district courts to consider traditional equitable principles "through the prism of the underlying purpose of Section 10(j), which is to protect the integrity of the collective-bargaining process and to preserve the Board's remedial power while it processes the unfair labor practice charge." *Miller v. California Pacific Medical Center,* 19 F.3d 449, 459–60 (9th Cir. 1994). The just and proper standard, incorporating the traditional equitable criteria for injunctive relief,[4] focuses on petitioner's likely success of prevailing on the merits of the Complaint's allegations. At a minimum the Petitioner must demonstrate a fair chance of success on the merits. *Id.* at 460. Under the "likelihood of success" standard adopted in *Miller,* the Court must make a judgment of "how" likely the petitioner is to succeed. The degree of likelihood is factored into the

the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. *Id.* (citations omitted).

**4.** The traditional equitable criteria (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

The moving party must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor and at least a chance of success on the merits." These two tests operate on a sliding scale so that the required degree of irreparable harm increases as the probability of success decreases.

balance of harms analysis on a "sliding scale," so when the balance of hardships tips sharply in the movant's favor only minimal likelihood of success need be shown and vice versa. *Id.* at 456.

 Into the traditional equitable analysis, the Court must factor in the district court's lack of jurisdiction over unfair labor practices and the considerable deference accorded to the NLRB by the court of appeals which will uphold decisions of the NLRB if its findings of fact are supported by substantial evidence and if it has correctly applied the law. Even in its de novo review of questions of law, the court of appeals gives considerable deference to the NLRB's construction and application the labor laws. *Id.; NLRB v. International Brotherhood of Electrical Workers, Local Union 112*, 992 F.2d 990 (9th Cir.1993). The Court must also take into account the probability that declining to issue the injunction will permit allegedly unfair labor practices to reach fruitation and, thereby, the NLRB's remedial authority will be rendered meaningless. *Miller*, 19 F.3d at 456 (citing *Amoco Prod., Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (if injury is sufficiently likely, balance of harm will usually favor issuance of injunction).

 So while the Court is not required to defer to the Board in deciding whether interim relief is just and proper, the Court evaluates the probability of Petitioner's success in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference. While Petitioner can prevail with a showing of a "fair chance" or "modest chance" of success, *id.*, at 457, 460, if the NLRB demonstrates that it is likely to succeed on the merits the Ninth Circuit presumes that irreparable injury exists, *id.* at 460. Petitioner can show "likelihood of success" by producing "some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.* The presumption operates because in a statutory enforcement case when the government meets the "probability of success" prong for injunctive relief, the passage of the statute implies that Congress has de-

termined violations harm the public. *Id.* at 459.

 If this Court finds that the NLRB has only made a colorable evidentiary showing on the unfair labor charges, it must assess the possibility of irreparable injury. *Id.* If the Court, however, finds that the NLRB has produced some evidence to support the unfair labor practice charge, together with an arguable legal theory, a presumption of irreparable injury exists. *Id.* at 460. When exercising its equitable discretion, this Court must factor in the public interest and pay particular attention to the public consequences of employing the extraordinary remedy of injunction. *Id.* (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). "In 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Id.* "Thus, the courts must consider the extent to which this interest is implicated under the circumstances of the particular case." *Id.*

### B

### FINDINGS OF FACT

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

1. On **June 6, 1997**, Respondent finalized the purchase of TR & S, changing the name to Tucson Ready Mix.[5] On June 6, at the close of the business day, Tucson Ready Mix terminated all employees. The following day, a meeting was held for interested applicants to learn about Tucson Ready Mix and to file employment applications. The ex-TR & S employees were told that Tucson Ready Mix had "the right, having purchased the assets of TR & S, to establish new wages, hours and working conditions on the date we take over." (Respondent's Memorandum of Points and Authorities (R's Memo.) at Exhibit 1(B).) The prospective employees were told that although as TR & S employees they had been covered by a collective bargaining agreement, that contract was no longer appli-

---

**5.** This and other factual findings which do not refer to the record are undisputed.

cable, and that wages, hours and working conditions would be set by Tucson Ready Mix. (R's Memo. at Exhibit 1(B)); (Appendix of Exhibits in Support of Petition for Injunction Under § 10(j) (P's Exhibits) at 00072 (relying on Collective Bargaining Agreements at Article II pp. 34, 52.)

2. The benefits offered by Tucson Ready Mix, by and large, were the same as those at TR & S. Wages, however, *exceeded* those existing under the TR & S bargaining agreement by approximately 50 cents to one dollar. (P's Exhibits at 000120, 00122, 00128, 00130, 00134, 00136, 00139, 00141, 00143, 00146.) Tucson Ready Mix rehired all, but four, of TR & S's 129 employees. (P's Exhibits: Martinez Depo. at 00119.) At this initial meeting, Tucson Ready Mix expressed the following views regarding unions:

> employees do not need a union, but the bottom line is that that issue is one that is ultimately up to you and not to us. No matter how that issue is decided, we will respect your wishes and desires in the future.

(R's Memo. at Exhibit 1(B) pp. 4–8.) Managers for Tucson Ready Mix had a prepared script to answer employee questions regarding union which encouraged employees to work directly with management regarding any work related concerns. (R's Memo. at Exhibit 1(B) pp. 4–8.)

3. On June 10, 1997, within four days of Tucson Ready Mix's June 6, 1997, purchase of TR & S, the Unions contacted Respondent's attorneys complaining that Tucson Ready Mix had a legal obligation to recognize them and to bargain with the Unions prior to changing wages, benefits, or any other working conditions. (P's Exhibits at 69, 70.) The Unions demanded that working conditions under the bargaining agreement be reinstated at Tucson Ready Mix. (P's Exhibits at 69, 70.) Correspondence went back and forth between the Unions and Respondent, with Tucson Ready Mix contesting its status as a "successor employer" under *N.L.R.B. v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) and *Fall River Dyeing & Finishing v. NLRB,* 482 U.S. 27, 107 S.Ct.

2225, 96 L.Ed.2d 22 (1987), and denying any duty to enter into collective bargaining before unilaterally changing employee's wages, hours and working conditions. (P's Exhibits at 000072, 00074.) Tucson Ready Mix charged that the Unions could not establish that they represented a majority of the employees. (P's Exhibits at 00072, 00074, 00078.) Tucson Ready Mix also questioned whether it was an "employer within the building and construction industry" for purposes of § 8(f) of the NLRA and argued that its obligations under the NLRA depended on whether the Unions had been voluntarily recognized by Respondent's predecessor TR & S or certified by an employee vote. (P's Exhibits at 00078, 00081).

4. On July 24, and August 1, 1997, the Operators Union and the Teamsters Union, respectively, threatened to pursue all lawful means under the NLRA, including filing unfair labor practice charges with the NLRB, if Tucson Ready Mix continued to delay recognition and bargaining. (P's Exhibits at 82, 84.) On **July 25,**[6] **and August 5**[7], 1997, (P's Exhibits at 00083, 00086), Tucson Ready Mix agreed to recognize the Unions. **A period of approximately 2 months had passed since Tucson Ready Mix's acquisition of TR & S.**

5. On **August 6, 1997,** employee Steven P. Peterson filed a petition with the NLRB to decertify the Operators Union (Case 28–RD–779). (P's Exhibits at 00104.) The Union filed an unfair labor practice charge regarding the lack of recognition and bargaining with the NLRB on **August 12, 1997** (Case 28–CA–14582). (P's Exhibits at 00001.) On **August 15, 1997,** the Teamsters Union filed its corresponding unfair labor practice charge with the NLRB (Case 28–CA–14595). (P's Exhibits at 00002.) On **August 21, 1997,** employee Benjamin F. Shupp filed a petition to decertify the Teamsters Union (Case 28–RD–782). (P's Exhibits at 00108.) According to § 11730.3 of the Board's Casehandling Manual, filing of the NLRA charges blocked consideration of the decertification petitions, pending a determination on the unfair labor practice charges.

---

**6.** Tucson Ready Mix agreed to recognize the Operators Union. (P's Exhibits at 00083.)

**7.** Tucson Ready Mix agreed to recognize the Teamsters Union. (P's Exhibits at 00086.)

(P's Exhibits 00110–11.) **Exactly two months had passed from the time Tucson Ready Mix took over TR & S and the filing of the first decertification petition; shortly, thereafter, the NLRA charges and the Teamsters' decertification petition followed.**

6. Also beginning August 6, 1997, the Unions and Respondent began corresponding in an unsuccessful attempt to schedule union negotiations. (P's Exhibits at 00087–94.) Finally, on November 11, 1997, the Operators Union contacted Respondent's attorney complaining that it had been four weeks since a phone conversation regarding meeting dates and demanded that he stop "stalling" and set a meeting date. (P's Exhibits at 00089.) Again, the Operators Union threatened to take legal recourse if Tucson Ready Mix did not come to the bargaining table. (P's Exhibits at 89.) Tucson Ready Mix's attorney responded on **November 13, 1997,** accusing the Union of dropping the scheduling ball, but explaining it no longer mattered because as of the filing of the decertification petitions, Tucson Ready Mix's duty to recognize and bargain with the Unions ended. (P's Exhibits at 00090. The Teamsters Union's demand for action came in December when it set a negotiation deadline of **December 15, 1997.** (P's Exhibits at 00094.) The date came and went with no response from Tucson Ready Mix. Belatedly, on January 5, 1998, Respondent informed the Teamsters Union that it had withdrawn recognition of the Unions.[8] (P's Exhibits at 00095.)

7. Although its correspondence reflects otherwise, Tucson Ready Mix asserts it "never explicitly refused to recognize and bargain with the Unions, but rather was making inquiries into the origins of the Unions' claims that they represented a majority of the bargaining unit, (Answer at 6(*o*), (q)), until petitions were filed to decertify the Unions, and thereafter, based on a good-faith belief that the Unions no longer represented a majority of the employees, Tucson Ready Mix refused

to bargain with the Unions, (Answer at 6(m), (n)); (R's Memo. at Exhibit 1: Hudder Affidavit at ¶ 15–16.)"

8. As Respondent asserts, on September 30, 1997, the NLRB found that there was insufficient evidence to establish that Tucson Ready Mix had unlawfully promoted, assisted and otherwise encouraged the circulation of the decertification petitions and dismissed that charge against Respondent. (P's Exhibits at 00150, 00153.) Nevertheless, the NLRB issued Complaints on the two remaining unfair labor practice charges (P's Exhibits 00006): 1) Respondent unlawfully withheld recognition from the Unions from June 7 through July 25, 1997, and 2) Respondent unilaterally instituted new terms and conditions of employment including, but not limited to, changing wages, holidays, and eliminating the grievance-arbitration procedures. The NLRB consolidated the cases: Case 28–CA–14582 (P's Exhibits at 00150) and Case 28–CA–14595 (P's Exhibits at 00153).

9. Following their November and December communications with Respondent, in **December,** the Unions filed additional charges (amended Case 28–CA–14595 and Case 28–Ca–14862) alleging that Tucson Ready Mix had withdrawn recognition of the Unions and refused to enter into collective bargaining. (P's Exhibits at 00003–00005.) The Unions also charged that in November, Respondent had again unilaterally raised wages by approximately 70–95 cents per hour. On **December 24, 1997,** the Teamsters Union requested that the NLRB Regional Director seek 10(j) injunctive relief. On January 15, 1998, the NLRB wrote Respondent giving notice that is was issuing a Second Amended Complaint, consolidating all the cases (28–CA–14582; 28–CA–14595; 28–CA–14862), and that it would seek 10(j) relief. (R's Memo. at 4.) Whereas, previously the NLRB had not sought injunctive relief because Respondent professed to recognize the Unions and agreed to bargain, now 10(j) relief was

---

**8.** These dates are important because Respondent argues that Petitioners' 6-month delay in seeking relief demonstrates the lack of irreparable injury. (R's Memo. at 11.) These documents suggest that until November and December, the Unions believed Respondent was agreeing to collectively bargain. *Also see, Aguayo v. Tomco Carburetor*

*Co.,* 853 F.2d 744, 750 (9th Cir.1988) (delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order will be as effective as interim relief) *overruled on other grounds, Miller,* 19 F.3d 449.

warranted. (R's Memo. at 4.) The NLRB filed the 10(j) petition with this Court on April 15, 1998. The NLRB hearing was held April 28, 1998. This Court heard oral argument on the 10(j) petition on May 8, 1998.

10. **Tucson Ready Mix admitted by stipulated fact at the NLRB hearing that it is a successor employer under *Burns*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 and *Fall River*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22.**

## C

### *CONCLUSIONS OF LAW*

To the extent any of the Findings of Fact contain or include any Conclusions of Law, said Findings of Fact are incorporated herein by reference.

1. Tucson Ready Mix asserts that it properly withdrew its recognition of the Unions after the August-filings of the decertification petitions based on good-faith doubt regarding the Unions' majority status. Tucson Ready Mix bases its assertion on the NLRB's finding that there was insufficient evidence to conclude that Tucson Ready Mix unlawfully promoted, assisted, or otherwise encouraged the circulation of the decertification petitions. Tucson Ready Mix argues that because it does not dispute its successor status under *Burns* and *Fall River,* and because it recognized the Operators Union on July 25, 1997, and the Teamsters Union on August 5, 1997, the alleged unfair labor practices are isolated to the delayed period of recognition: June 6, to August 5, 1997. Respondent characterizes this delay as de minimus and as being the natural consequence of conducting the necessary communications to determine its obligations under the NLRA. Framed this way, Tucson Ready Mix submits that the NLRB has little likelihood of succeeding on the merits of the underlying case.

2. The law regarding withdrawal of recognition is as follows:

The general rule is that once a union has been certified by the Board as collective bargaining agent, it enjoys a presumption of continued majority status which is irrebuttable for the first year and rebuttable thereafter. (citations omitted). After the initial year, an employer may rebut the presumption and withdraw recognition if

the employer has a reasoned basis in fact to doubt the union's continuing majority status. (citations omitted). The reasonable doubt must be asserted in good faith and may not be raised in order to cause disaffection with the union. (citations omitted) It is well settled that reasonable doubt of a union's majority status will be found if the asserted doubt is based on objective considerations and such doubt is raised in a context free of unfair labor practices "of such a character as to either affect the Union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." (citations omitted). A petition signed by a majority of employees in which they indicate that they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status. (citations omitted).

*Sullivan Industries v. NLRB,* 957 F.2d 890, 898 (D.C.Cir.1992), *supp. decision,* 322 NLRB 925 (1997).

3. Tucson Ready Mix, however, overlooks the next important sentence in *Sullivan:*

**If, however, the General Counsel for the Board comes forward with evidence to show that the union's decline in support was attributable to the employer's misconduct, the employer's good-faith defense to the withdrawal of recognition will fail.**

*Id.* (citations omitted) (emphasis added).

4. Respondent's concession that it is a successor employer under *Burns* and *Fall River* does not enable it to side step liability on Petitioner's charge that it unlawfully refused to recognize and bargain with the Unions. Instead, the stipulation establishes liability on the part of the Respondent for nonrecognition and refusals to bargain related to its assertions that it was not a successor employer. The documents presented to this Court strongly suggest that from the beginning, Tucson Ready Mix did not intend to recognize or bargain with the Unions. (P's Exhibits at 00068, 00072, 00074; (R's Memo. at Exhibit 1(B).) Two months passed before Respondent extended recognition, but Respondent never entered into collectively-bargaining. Having conceded liabil-

ity under *Burns* and *Fall River*, the Court does not need to consider the legitimacy of Respondent's delay related to its assertions that it was not a successor employer. The Court only considers Respondent's other two challenges: 1) the Unions did not have majority status and 2) it was a ¶ 8(f) employer.

■ 5. It is well established that an incumbent union which has had a bargaining relationship with the predecessor employer enjoys the presumption of majority support which can only be rebutted with "clear cogent, and convincing evidence, that the union was in the minority or that the employer had a good faith reasonable doubt of majority support raised in the absence of unfair labor practices." *Fall River Dyeing; NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979). To overcome the presumption the employer must show, either 1) the union did not enjoy majority support, or 2) it had a good faith doubt, founded on sufficient objective basis, of union's majority support. *Auciello Iron Works v. NLRB*, 517 U.S. 781, 116 S.Ct. 1754, 1758–60, 135 L.Ed.2d 64 (1996). It is also well established that the source of a union's representational status, whether by voluntary recognition or certification, is irrelevant to an employer's obligation to bargain. *NLRB v. Dent*, 534 F.2d 844, 846 (9th Cir.1976); *NLRB v. Edjo, Inc., d/b/a Jose Costa Trucking*, 631 F.2d 604, 606–607 (9th Cir.1980).

■ 6. Under § 10(b) of the Act there is a 6–month statute of limitation which bars challenges to the Unions' source of representational status when as here, representational status was acquired beyond the 6–month limitation. The parties stipulated that the Unions represented the respective bargaining units since 1946, and the collective-bargaining agreements existing at the time Respondent acquired TR & S had been in place since 1995. The statute of limitations, therefore, barred Respondent's majority status charge that the Unions had never had majority status, but had been voluntarily recognized by its predecessors. *See Local Lodge 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (union lacked majority status at time collective bargaining agreement executed, but statute of limitation barred charge regarding enforcement of agreement).

■ 7. Respondent's delay attributed to its concern that it was a § 8(f) employer was completely baseless. Respondent, a distributor of sand, rock and cement products, is not an "employer engaged primarily in the building and construction industry." *See Teamsters Local 294 (Island Dock Lumber)*, 145 N.L.R.B.484, 491 (NLRB 1963), *enforced*, 342 F.2d 18 (2nd Cir.1965) (delivery of ready mix concrete not within § 8(f) construction industry proviso).

■ 8. Respondent's excuses for delaying recognition and bargaining with the Unions were without any basis in law or fact. Respondent's delay, based entirely on premises contrary to recognized NLRB precedent, cannot support Respondent's assertions that from June 6, to August 5, 1997, it conducted communications with the Unions which were necessary for determining its obligations under the NLRA. The delay was not reasonable.

■ 9. The delay was not de minimus. In circumstances such as arose here, the NLRB recognizes the following presumption:

[W]e reaffirm the Boards practice of presuming that, when an employer unlawfully fails or refuses to recognize and bargain with an incumbent union, any employee disaffection from the union that arises during the course of that failure or refusal results from the earlier unlawful conduct. In the absence of unusual circumstances, we find that this presumption of unlawful taint can be rebutted only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining. Only such a showing of bargaining for a reasonable time will rebut the presumption.

*Sullivan Industries, Inc.*, 1997 WL 30602, 322 NLRB at 926 (quoting *Lee Lumber and Building Material Corp.*, 1996 WL 523011, 322 NLRB 175, 178 (1996), *aff in part, re-*

*manded on other grounds,* 117 F.3d 1454 (D.C.Cir.1997).

10. This presumption has been adopted by some courts. *See Lee Lumber,* 117 F.3d 1454; *Harter Tomato Products Co. v. N.L.R.B.,* 133 F.3d 934 (D.C.Cir.1998), but without relying on it, this Court finds that Respondent's delay, having no basis in law or fact, and flying in the face of accepted NLRB precedent, prevents Tucson Ready Mix from making the necessary showing: a good-faith reasonable doubt of majority support raised in the absence of unfair labor practices. *Tahoe Nugget,* 584 F.2d at 297.

▮ 11. At the time Tucson Ready Mix purchased TR & S, the employees were represented by the Unions and had been so represented for an extended period of time. There is no evidence of any anti-union activities occurring prior to Respondent's acquisition. As of June 6, 1997, Respondent froze out the Unions. Respondent unilaterally raised wages and changed working conditions. Unilateral changes, especially wage increased, strike at the heart of a Unions ability to represent employees and are antithetical to the statutory objective of establishing working conditions through collective bargaining. "The danger inherent in well-timed increases in wages and benefits is the suggestion of a fist inside a velvet glove." *N.L.R.B. v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Employees are quick to recognize the power source from which their benefits flow and realize that if they fail to acquiesce to the employer's anti-union sentiment the glove can readily become the fist. *Id.*

▮ 12. Respondent's conduct misinformed employees that under the law Tucson Ready Mix did not have to recognize nor bargain with the Unions, and that it could deal directly with employees. (R's Memo. at Exhibit 1(B).) Tucson Ready Mix inaccurately informed employees that the issue of Union representation would have to be decided *in the future* by the employees and

strongly suggested against unionization. (R's Memo. at Exhibit 1(B).) (emphasis added). Under the law, the incumbent Unions were entitled to a presumption of majority status, *see NLRB v. Williams Enterprises, Inc.,* 50 F.3d 1280, 1289 (4th Cir.1995) (citing *Fall River,* 482 U.S. at 37–38, 107 S.Ct. 2225) (incumbent union enjoys presumption of majority status), and Respondent was obligated to recognize and enter into bargaining upon request, *id.* at 1286 (citing *Fall River,* 482 U.S. at 52, 107 S.Ct. 2225) (obligations under NLRA triggered by Unions' bargaining demand). There was no union-issue to be decided in the future.

▮ 13. It is well recognized that support for a union erodes when the union is unable to protect the employees or affect working conditions. *Fall River,* 482 U.S. at 27 n. 7, 107 S.Ct. 2225. It is, therefore, not surprising that within two months, the atmosphere had changed dramatically, with over 50 percent of the workers signing petitions calling for an election on the issue of union representation. *See also, Franks Bros., Co. v. NLRB,* 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944) (recognizing the legitimacy of the Board's view that the unlawful refusal to bargain collectively with employees' chosen representative disrupts employee morale, deters organizational activities, and discourages membership in unions.)

14. Petitioner has come forward with "some" evidence supporting its assertion that the Union's decline resulted from Respondent's unfair labor practices. *See Miller,* 19 F.3d at 460 (threshold showing of likelihood of success can be made by producing some evidence). Petitioner has presented some evidence that the decertification petitions were tainted.[9] Without the decertification petitions to rely on, Respondent cannot establish a good faith doubt of the Unions' majority status and there is a strong likelihood that Petitioner will prevail on the merits of the underlying unfair labor practice

---

9. The Board considers four factors when determining weather unremedied unfair labor practices tainted subsequent expressions of employee disaffection, i.e., decertification petitions: 1) the length of time between the unfair labor practices and the withdrawal of recognition; 2) the nature of the illegal acts, including the possibility of

their detrimental or lasting effect on employees; 3) any possible tendency to cause employee disaffection from the union, and 4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union. *NLRB v. Williams Enterprises, Inc.,* 50 F.3d 1280, 1288 (4th Cir.1995).

charges. The strength of the Petitioner's case raises a presumption that irreparable injury will occur unless this Court issues the requested injunction. *See id.* at 459 (citing *United States v. Nutri–cology, Inc.,* 982 F.2d 394, 398 (9th Cir.1992)) ("... if the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury.") [10]

15. "In 10(j) cases, the public interest is to ensure that unfair labor practices will not succeed because the Board takes too long to investigate and adjudicate the charge." *Id.* at 460. Employees at Tucson Ready Mix have been without union representation for almost one year and further delay further erodes the Unions' support. The balance of hardship is faced by Petitioner. Here, Respondent confronts incumbent Unions, entitled to presumptions of majority status. The distinction is significant [11] because, here, an injunction reseats the unions, restores the bargaining rights of the majority, and protects the status quo as it existed when Respondent purchased TR & S.

Accordingly,

**THE COURT FINDS** that Petitioner has a substantial likelihood of success in prevailing in the underlying administrative proceeding in Cases 28–CA–14582, 28 CA–14595, and 28–CA–14862 by establishing that Respondent has engaged in, and is engaging in, unfair labor practices in violation of § 8(a)(1) and (5) of the Act by: refusing to recognize and bargain with the Operators Union as the exclusive representative of Respondent's employees in the Operating Engineers Unit who comprise an appropriate unit for purposes of collective bargaining and refusing to recognize and bargain with the Teamsters Union as the exclusive representative of Respon-

dent's employees in the Teamsters Unit who comprise an appropriate unit for purposes of collective bargaining. These acts are exerting a substantial and severe impact on the § 7 rights of Respondent's employees. More particularly, Petitioner will establish the facts as set forth, herein, in subsection B: Findings of Fact, paragraphs 1–10.

To preserve the issues for the orderly determination provided in the Act and prevent irreparable injury to the purposes and policies of the Act, it is appropriate, just and proper that, pending the final disposition of the matter here involved now pending before the Board, Respondent, its officers, representatives, agents, servants, employees and all persons acting on its behalf, be enjoined and restrained from the commission, continuance or repetition of the acts and conduct set forth, herein, in subsection B: Findings of Fact, paragraphs 1–10, acts or conduct in furtherance or support thereof, or like or related acts or conduct, the commission of which in the future is likely or may fairly be anticipated from the acts and conduct of Respondent in the past.

**IT IS ORDERED** that, pending the final disposition of the matters involved pending before the National Labor Relations Board, the Petition for Injunction under § 10(j) of the NLRA is GRANTED.

**IT IS FURTHER ORDERED** that Respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it, or them, be, and they hereby are enjoined and restrained from:

(A) Failing to recognize and bargain with the International Union of Operating Engineers, Local 428, AFL–CIO (the Operators

10. "If the respondent concedes the substance of the unfair labor practice charge, ... we presume irreparable injury." *Miller,* 19 F.3d at 459 (citing *Nutri–cology,* 982 F.2d at 398). Here, Respondent concedes that it was a successor employer under *Burns* and *Fall River,* and had a duty to recognize and bargain with the Unions. Consequently, this Court presumes irreparable injury exists in relation to Petitioner's claim that Respondent unlawfully asserted it was not a successor employer.

11. In contrast, a non-incumbent union never enjoyed a presumption of majority status; there-

fore, an injunction would grant such a union a better position than the status quo—before the company's unlawful conduct, a non-incumbent union did not have recognition as the bargaining agent. *Williams Enterprises,* 50 F.3d at 1289. The cases relied on by Respondent, such as *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 602, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), involved non-incumbent unions where the employer could have refused recognition of the union as long as they did not engage in unfair labor practices precluding the possibility of an election.

Union) as the exclusive collective bargaining representative of employees in the following unit (the *Operating Engineers Unit*):

All employees employed in the classifications of equipment operators, plant operators, operator mechanics, and oilers working at, or out of [the Respondent's] Tucson, Arizona metropolitan area locations; but excluding all other employees, office and clerical employees, professional employees, guards, foremen, and supervisors as defined in the National Labor Relations Act.

(B) Failing to recognize and bargain with the International Brotherhood of Teamsters, Local 104, General Teamsters (Excluding Mailers), State of Arizona, an affiliate of International Brotherhood of Teamsters, AFL–CIO (the Teamsters Union) as the exclusive collective bargaining representative of employees in the following unit (the Teamsters Unit):

All employees employed in the classifications of truck drivers and mechanics working at, or out of [the Respondent's] Tucson, Arizona metropolitan area locations; but excluding all other employees, office and clerical employees, professional employees, guards, foremen, and supervisors as defined in the National Labor Relations Act.

(C) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights to self-organization, to form labor organizations, to join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities, except to the extent that such right be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a)(3) of the Act [29 U.S.C. Sec. 158(a)(3) ], as modified by the Labor–Management Reporting and Disclosure Act of 1959.

**IT IS FURTHER ORDERED** that upon request, Respondent shall recognize and bargain in good faith with the Operators Union, as the exclusive collective-bargaining representative of the Operators Unit employees, concerning wages, hours, and other terms and conditions of employment and, if any understanding is reached, embody the understanding in a signed agreement.

**IT IS FURTHER ORDERED** that upon request, Respondent shall recognize and bargain in good faith with the Teamsters Union, as the exclusive collective-bargaining representative of the Teamsters Unit employees, concerning wages, hours, and other terms and conditions of employment and, if any understanding is reached, embody the understanding in a signed agreement;

**IT IS FURTHER ORDERED** that Respondent shall post copies of this Order at Respondent's Tucson, Arizona Facilities, where notices to employees are customarily posted, making reasonable efforts to assure that such copies are not removed or defaced, and posting replacement copies in the event of such removal or defacement.

**IT IS FURTHER ORDERED** that within 20 days of the date this Order issues, Respondent shall file with the Court, and copy the Director for Region 28, sworn affidavits from responsible officials or Respondent setting forth with specificity the manner in which Respondent is complying with the terms of this Order.