KING, Circuit Judge,
dissenting:
Since 1935, the National Labor Relations Board has been accorded the authority and responsibility for resolving our nation’s labor disputes and remedying the effects of unfair labor practices, whether engaged in by corporate management or by labor unions. A necessary corollary to the Board’s authority has been that our judicial branch of Government does not substitute its judgment for that of the Board. The Board, rather than the courts, is the labor expert, and the judiciary is obliged to defer to its expertise, monitoring the Board solely to ensure that it does not exceed its authority.
In approaching this longstanding and bitter dispute between Overnite Transportation Company and the Teamsters Union, the Board has applied its expertise, and it has concluded that Overnite engaged in a litany of unfair labor practices. It has also taken appropriate action, pursuant to its statutory authority and the Supreme Court’s landmark decision in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), ordering Overnite to bargain with the Union at four of its service centers. In reviewing this dispute, the en banc majority has concluded, and I agree, that substantial evidence *443 supports the Board’s findings that Over-nite engaged in unfair labor practices in its discriminatory March 1995 wage increase, and that it also unlawfully interfered with organizing campaigns at the Lawrence-ville, Louisville, Norfolk, and Bridgeton service centers. Regrettably, however, in its consideration of the other unfair labor practices found by the Board, and in its review of the Board’s chosen remedy of Gissel bargaining orders, the majority has substituted its judgment for the expertise of the Board. In so doing, it has ignored controlling legal principles: we must defer to the Board on findings of fact supported by substantial evidence and, in the absence of an abuse of discretion, we must enforce the Board’s chosen remedy for unfair labor practices. Because I strongly believe the Board’s decisions to be appropriate under the law and on these facts, I would grant enforcement of its bargaining orders, and I respectfully dissent.[1]
I.
As the majority properly observes, the Board’s findings of fact are conclusive so long as they are “supported by substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(e); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Indeed, if an ALJ’s factual findings, as adopted by the Board, are supported by substantial evidence, “our inquiry ends ... even though we might have reached a different result had we heard the evidence in the first instance.” NLRB v. Daniel Constr. Co., 731 F.2d 191, 193 (4th Cir.1984) (citation omitted). Our judiciary has consistently recognized that the Board must be accorded broad discretion in its crafting of remedies to resolve labor disputes. Accordingly, the Board’s chosen remedy must be enforced by the judiciary “unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA.” NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1289 (4th Cir.1995).
In my considered opinion, the en banc majority has inappropriately substituted its judgment for that of the Board in three crucial respects. In contravention of the Board’s exhaustive findings of fact, the majority now incorrectly determines that:
• Overnite did not commit unfair labor practices when it instituted the discriminatory January 1996 wage increase.
• Overnite’s coercive questioning of employees at its Louisville service center did not violate the Act.
• Overnite’s litany of severe and pervasive unfair labor practices does not support the Board’s chosen remedy of Gissel bargaining orders.
In order to support these determinations, the majority has erroneously re-weighed the evidence relating to each of these important issues. First, there is more than substantial evidence to support the Board’s findings, in connection with Overnite’s discriminatory January 1996 wage increase, that Overnite bypassed the Union, discriminated against union employees, and publicized its unlawful conduct. Second, there is also ample evidence to support the Board’s finding that Overnite’s coercive questioning of employees at Louisville exceeded any legitimate purpose. Finally, and most significantly, the evidence overwhelmingly demonstrates that the Board *444 did not abuse its discretion in its issuance of Gissel bargaining orders to remedy Ov-ernite’s anti-union conduct at four of its service centers.
The majority sees the Gissel bargaining orders as undermined by mitigating factors, including the lack of continuing misconduct, the employee turnover rate, the passage of time, and the success of the Union in elections at other service centers. The Board, however, carefully considered each of these factors, and it ruled against Overnite. Its Decision and Order should be enforced. Overnite, 329 N.L.R.B. 1 (Nov. 10,1999).
I will address these three issues in turn.
II.
My first disagreement with the en banc majority relates to its conclusion that Ov-ernite’s discriminatory January 1996 wage increase did not violate the Act. Although the majority acknowledges that Overnite committed unfair labor practices in its discriminatory March 1995 wage increase and in its pervasive “carrot and stick” campaigns at the Lawrenceville, Louisville, Norfolk, and Bridgeton service centers, it erroneously concludes that Overnite’s unfair labor practices ceased in mid 1995. I am compelled to disagree: there is more than substantial evidence to support the Board’s finding that the discriminatory January 1996 wage increase violated three subsections of the Act, i.e., §§ 8(a)(1), (3), and (5).[2] Indeed, the detailed findings made by the ALJ and the Board[3] reflect that: (1) Overnite bypassed the Union by giving it only one day to consider the proposed January 1996 wage increase and the related productivity agreement before making its presentation directly to employees; (2) Overnite made a unilateral change to its employees’ terms and conditions of employment by awarding the January 1996 wage increase to non-union employees only; and (3) Overnite thereafter distributed anti-union campaign fliers boasting that its union employees were being paid less than its non-union employees.
A.
In December 1995, Overnite offered its employees a fifty-cent-per-hour wage increase. This wage increase, however, was conditioned on acceptance by the Union of the related productivity agreement whereby Overnite would have the right, inter alia, to “ ‘[s]et, change and cancel days and hours of work’ for all job classifications; and, within certain limitations, to ‘[s]et ... schedules, routes, and running times.’ ” *445 Overnite, 329 N.L.R.B. at 57. Overnite gave the Union virtually no notice of the proposed productivity agreement, nor any time to consider it. In this connection, the ALJ found that Overnite had effectively bypassed the Union, as follows:
What Overnite did here was to send by overnight mail its productivity agreement to the Union, wait 1 day, and then make its presentation to the employees directly, 2 days before negotiations were to or did resume. That bypasses the Union in the same way as if [Ovemite] never made any proposal at all to the Union, and [Overnite] certainly gave the Union no adequate opportunity to digest the proposal or to respond or to begin discussion.
Id. at 58 (emphasis added). Indeed, Over-nite had been planning to implement its productivity changes for at least two months before it notified the Union of the proposal, at the last minute, by overnight mail. Overnite’s clear goal was to circumvent the Union, and the company admitted as much following presentation of the productivity package in Atlanta. Mr. Schager, Overnite’s Atlanta manager, explained to an employee that “[w]e don’t, we won’t notify the Union any more on anything. That’s the whole point of this on the productivity package and so forth. We now will make changes as we see ‘em....” Id. at 58 n. 95. Based on its thorough review of the evidence, the ALJ found that Over-nite had “concluded that it would be ‘much more effective’ to make the productivity package palatable by dealing directly with the unionized employees rather than having to deal only with their bargaining representatives; and so the conscious effort was made to bypass the national committee.” Id.
This anti-union activity of Overnite constituted a clear violation of §§ 8(a)(1) and (5) of the Act, which prohibit an employer from bargaining directly with employees that are represented by a union. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944) (explaining that employer violates § 8(a)(1) of the Act when it “ignor[es] the union as the employees’ exclusive bargaining representative, by negotiating with its employees concerning wages at a time when wage negotiations with the union were pending, and by inducing its employees to abandon the union by promising them higher wages”); see also Holly Farms Corp. v. NLRB, 48 F.3d 1360, 1368 (4th Cir.1995). The Board’s finding of this unfair labor practice, i.e., Overnite bypassing the Union and seeking to bargain directly with its represented employees, is supported by more than substantial evidence. In rejecting it, the majority has simply substituted its judgment for that of the Board.
B.
Ultimately, the Union’s national committee rejected the proposed productivity agreement and Overnite, in January 1996, unilaterally granted the fifty-cent-per-hour wage increase to its non-union employees only. The Supreme Court has long recognized that an employer violates §§ 8(a)(1) and (5) of the Act when it makes unilateral changes to established terms or conditions of employment. NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Accordingly, when an employer, by its promise or course of conduct, has made an annual wage increase part of an established wage or compensation system, it cannot change or terminate the benefit unilaterally during the period of collective bargaining. See First Nat’l Maint. Corp. v. NLRB, 452 U.S. 666, 674-75, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981); Dorsey Trailers, Inc. v. NLRB, 233 F.3d 831, 838 (4th Cir.2000).
*446 In this connection, there is more than substantial evidence to support the Board’s finding that, by not providing the January 1996 wage increase to its union employees, Overnite changed the terms and conditions of their employment and hence violated the Act. As the ALJ explained, Overnite had theretofore consistently provided its employees with annual wage increases: “Since 1980, Overnite had a regular practice of granting across-the-board annual wage and mileage increases to all its employees. That was never broken.” Overnite, 329 N.L.R.B. at 58.
The en banc majority, to its credit, candidly acknowledges that substantial evidence supports the Board’s finding that Overnite had historically provided its employees with annual wage increases. The majority then finds, however, in contravention of the deferential standard of review to be accorded the Board, that “the nature of the wage increases was not sufficiently fixed to become a ‘term or condition of employment.’ ” Ante at 432. Its basis for this finding appears to be that Overnite did not award a wage increase in 1991, and that its 1994 wage increase was awarded as part of a Performance Incentive Plan.
This finding by the majority is, for several reasons, fatally flawed. First, it is incorrect to say that the 1991 wage increase was not awarded. While the 1991 increase was due to be implemented in October 1991, it was delayed for three months until January 1992. Subsequently, from 1992 onward, the annual wage increase was made in January. Thus, as the ALJ specifically found, “[e]xcept for that one 15 month period, increases ha[d] been given every 12 months.” Overnite, 329 N.L.R.B. at 58 n. 96. Second, the fact that the 1994 wage increase was awarded as part of the Performance Incentive Plan does not alter the fact that in each year since 1980, including 1994, Overnite had awarded its employees an annual wage increase. See Eastern Maine Med. Ctr. v. NLRB, 658 F.2d 1, 8 (1st Cir.1981) (explaining that indefiniteness of amount, plus fact that company has “flavor of discretion,” does not prevent annual wage increase from becoming term or condition of employment).
Without fail, Overnite awarded wage increases to its employees each year from 1980 through 1996, thus making it apparent to both the ALJ and the Board that an annual wage increase was a term and condition of employment with Overnite. As such, there is compelling and substantial evidence to support the Board’s finding that Overnite, in denying the January 1996 wage increase to its union employees, made an illegal unilateral change to established terms and conditions of their employment.
C.
Finally, the en banc majority ignores compelling evidence that Overnite took affirmative steps to ensure that its discriminatory January 1996 wage increase would be noticed by its employees. The ALJ found that Overnite had “publicized the withholding of the increase to demonstrate that voting for the Teamsters presented serious, adverse consequences.” Overnite, 329 N.L.R.B. at 60. And Overnite flaunted its actions, taunting the Union and its members by distributing anti-union “campaign flyers stating that employees in the represented units were 50 cents per hour behind non-union employees after the 1996 wage increase and blamed the Union for refusing to allow the employees it represented to accept the increase and refusing to bargain about the increase.” Id. Moreover, as the ALJ found, Overnite’s anti-union propaganda continued well after January 1996: “[additional flyers, apparently issued after [Overnite] increased *447 wages in 1997, called attention to the fact that the non-union employees earned 95 cents more than those represented by the Teamsters.” Id. at 60 n. 103 (emphasis added). This uncontradicted activity on the part of Overnite plainly contravened both §§ 8(a)(1) and (3) of the Act, which prohibit an employer from discriminating with regard to a term or condition of employment in order to encourage or discourage union membership. See NLRB v. Great Dane Trailers, 388 U.S. 26, 32, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (“The act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity.”).
D.
This record compellingly indicates, with respect to Overnite’s discriminatory January 1996 wage increase, that (1) it bypassed the Union and bargained directly with represented employees, in violation of §§ 8(a)(1), and (5); (2) it discriminated against the Union and its members by awarding the wage increase to non-union employees only, in violation of §§ 8(a)(1) and (5); and (3) it flaunted its illegal activities by blaming the Union for the wage differential between the union and the nonunion employees, in violation of §§ 8(a)(1) and (3). Because there is more than substantial evidence supporting the Board’s findings of these unfair labor practices, the en banc majority has erred in its decision to the contrary.
III.
My second disagreement with the en banc majority concerns its assault on the Board’s finding that certain questions asked by Overnite’s attorneys to employees at its Louisville service center were coercive in nature, in violation of § 8(a)(1) of the Act. The majority vacates the Board’s conclusion that two questions, submitted to the Louisville employees in preparation for the ALJ’s hearing (“Attorneys’ Questions”), were coercive in nature:
• If you didn’t sign the card or petition the first time you were asked, why did you sign it when you were asked to do so again?
• Did anyone from the Union tell you it was important for you to report to the Union or any employee any problems you had with the Company since the Union needed unfair labor practice charges to help them overturn the election? If yes, who?
Overnite, 329 N.L.R.B. at 62.
Notwithstanding the majority’s contention to the contrary, there is substantial evidence in this record to support the Board’s finding that the Attorneys’ Questions violated the Act. In Johnnie’s Poultry Co., 146 N.L.R.B. 770 (1964), the Board set forth specific rules under which an employer may interview an employee in preparing a defense to an unfair labor practice allegation. Among other things, “the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee’s subjective state of mind, or otherwise interfering with the statutory rights of employees.” Id. at 775; see also Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1141 n. 8 (4th Cir.1982) (quoting Johnnie’s Poultry Co.). As the ALJ found, the first of the Attorneys’ Questions inquired why the employees signed the bargaining cards, thus impermissibly probing the employees’ subjective states of mind. Overnite, 329 N.L.R.B. at 62. Indeed, the majority acknowledges as much, *448 noting that it is “possible” that the ALJ was correct in determining that Overnite was improperly inquiring into the employees’ subjective reasoning. Ante at 434. The second of the Attorneys’ Questions is impermissible because it exceeded Over-nite’s legitimate purposes for questioning employees. Overnite, 329 N.L.R.B. at 62. Although Overnite was entitled to determine whether there was an improper inducement in the Union’s procurement of bargaining cards, its second question pried into unrelated matters, asking whether anyone from the Union had asked the employees to report unfair labor practices.
Rather than according the Board deference on the Attorneys’ Questions, the en banc majority has substituted its own finding for that of the Board. It has long been settled, however, that the Board “may draw reasonable inferences from the evidence.” Owens-Coming Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1362 (4th Cir.1969). And it was entirely reasonable for the Board to conclude that the Attorneys’ Questions probed the subjective intent of the employees and exceeded Overnite’s legitimate purposes. As such, the Board’s finding that Overnite’s conduct in connection with the Attorneys’ Questions constituted an unfair labor practice is supported by substantial evidence.
IV.
I turn now to my most fundamental disagreement with the en banc majority: its refusal to enforce the Board’s Gissel bargaining orders. While the majority properly agrees that Overnite engaged in severe and pervasive unfair labor practices that dissipated union majorities at Law-renceville, Louisville, Norfolk, and Bridge-ton, it nevertheless finds the presence of mitigating factors — the lack of continuing misconduct, the employee turnover rate, the passage of time, and the success of the Union in elections at other service centers — sufficient to demonstrate that fair elections could have been held at these four locations. The majority also finds that the Board failed to develop an adequate record on the possibility of holding fair elections at those four service centers. In so finding, the majority has faded to adequately consider three controlling points: (1) the broad discretion possessed by the Board in remedying such severe and pervasive labor violations; (2) the extent to which its four mitigating factors fail to limit the effects of Overnite’s anti-union activity; and (3) the extensive record supporting issuance of the Gissel bargaining orders. As such, the en banc majority again fails to accord the Board its proper deference.
A.
1.
Our courts have consistently recognized that the Board possesses broad discretion to craft appropriate remedies in unfair labor practice cases. Indeed, the Board’s chosen remedy must be enforced “unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA.” NLRB v. Williams Enters. Inc., 50 F.3d 1280, 1289 (4th Cir.1995). Notwithstanding the favored status of elections, the Board given its “fund of knowledge and expertise” must be accorded the special respect it is due in its fashioning of a remedy. NLRB v. So-Lo Foods, Inc., 985 F.2d 123, 126 (4th Cir.1992) (quoting Gissel, 395 U.S. at 612 n. 32, 89 S.Ct. 1918). Obviously, the more severe and pervasive the unfair labor practices, the greater the scope of appropriate remedial measures.
2.
In the Supreme Court’s unanimous decision in NLRB v. Gissel, rendered over *449 thirty years ago, Chief Justice Warren recognized the Board’s authority (and obligation) to issue remedial bargaining orders in two distinct situations. First, such orders may be appropriate in “Category I” cases, where “exceptional,” “outrageous,” and “pervasive” unfair labor practices have occurred, and where the coercive effects of such practices “cannot be eliminated by the application of traditional remedies.” Be-Lo v. NLRB, 126 F.3d 268, 274 (4th Cir.1997) (quoting Gissel, 395 U.S. at 613-14, 89 S.Ct. 1918). Second, and more typically, remedial bargaining orders may be issued by the Board in so-called “Category II” cases, where the Board has found that: (1) the Union once had majority status; (2) such majority status was dissipated by the employer’s pervasive misconduct; (3) there is only a slight possibility of erasing the effects of these past pervasive practices and ensuring a fair election; and (4) employee sentiment would, on balance, be better protected by issuance of a bargaining order. NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 996 (4th Cir.1979) (citing Gissel, 395 U.S. at 614, 89 S.Ct. 1918).
In fashioning a remedy in Category II Gissel cases, the Board must consider the scope and severity of the unfair labor practices, with an eye to their past effect on election conditions and the likelihood, if any, of their recurrence. See Gissel, 395 U.S. at 614, 89 S.Ct. 1918. If the Board concludes that a fair election cannot be adequately ensured by traditional remedies, and if “employee sentiment once expressed through [union authorization] cards would, on balance, be better protected by a bargaining order,” then as Chief Justice Warren observed, “such an order should issue.” Id. at 614-15, 89 S.Ct. 1918.
B.
In this situation, the Board classified Overnite’s misconduct against the Union and its employees as a Category II case, and it proceeded to issue Gissel bargaining orders for the service centers at Law-renceville, Louisville, Norfolk, and Bridge-ton. The majority recognizes that the Union had obtained signed card majorities before the earlier elections at the four service centers, and that the Union’s majority status at those locations was dissipated by Overnite’s repeated unfair labor practices. Ante at 436. After reweighing the evidence, however, the majority has decided that the Board should have found that fair elections could have been conducted at the four service centers, and, as such, it has determined that the Gissel bargaining orders are unwarranted. In fact, the Board’s record contains a litany of both national and unit-specific violations of the Act by Overnite. And, as we have observed, the scope of appropriate remedial measures is necessarily enhanced, as a matter of course, when the Board is addressing severe and pervasive unfair labor practices. Overnite’s anti-union activities — both nationally and at the four service centers — are more than sufficient to support the Board’s conclusion that fair elections could not be held at the four locations. In order to explain this position fully, I am constrained to further review the extensive evidentiary record compiled by the Board.
1. National Hallmark Violations
In making its decision on the Gissel bargaining orders, the Board emphasized the numerous “hallmark violations” committed by Overnite. Hallmark violations are those unfair labor practices “so coercive that their presence will support issuance of a bargaining order unless some significant mitigating circumstance exists.” So-Lo Foods, 985 F.2d at 126 (quoting NLRB v. Jamaica Towing, 632 F.2d 208, *450 212-13 (2d Cir.1980)). Where hallmark violations have been committed, the seriousness of the employer’s conduct justifies a finding — without extensive explication— that the unlawful activity is likely to have a lasting inhibitive effect on union elections. Id.
The Board found hallmark violations present in Overnite’s “highly coercive ‘carrot and stick’ campaign,” in which it granted selective wage increases to its unrepresented employees, while simultaneously communicating the futility of union negotiations and the likelihood of plant closures and job losses. Id. at 3. As the Board recounted with respect to Overnite’s wage manipulations:
[I]n March 1995, at the height of the organizational effort, [Overnite] unlawfully granted its unrepresented employees an unprecedented wage increase, just months after the employees had received their normal (January) increase .... At approximately the same time that [Overnite] was illegally rewarding its unrepresented employees, [Overnite] proclaimed in the company newsletter that “unfortunately” employees at the “four certified centers” where the Union had recently won Board elections “will not get these pay increases,” but “will have to wait for negotiations.” ... The message that [Ovemite’s] combined actions sent to employees was unmistakably clear: they could choose to remain unrepresented and enjoy any pay increase [Overnite] may grant in the future, or they could vote for union representation and forego such benefits.
Id. (emphasis added).
Although the discriminatory March 1995 wage increase reflected Overnite’s strong hostility to the Union’s organization efforts, it was not an isolated occurrence. Indeed, as the Board found, Overnite “again distinguished among its service centers based on their union or non-union status” in granting its wage increase the following year. Id. In January 1996, Over-nite again publicly withheld its wage increase from employees at union-represented service centers, while distributing flyers blaming the Union for the lower wages of those bargaining units. Id. The Board’s findings on this point characterized Over-nite’s tactics crisply: “[T]he message was clear: company wide wage increases would not be granted to employees who voted for the Union.” Id.
In addition, Overnite’s senior management threatened employees with the loss of their jobs if they voted for the Union. As the Board found, Jim Douglas, Over-nite’s President, personally travelled to more than fifty service centers in the course of implementing a nationwide anti-union campaign. He threatened that “a Union victory would ‘drive [Overnite] into nonprofit and put 14,000 jobs in jeopardy.’ ” Id. at 4. According to Douglas, a Union victory would jeopardize “the jobs and welfare benefits — everything.” Id.
With this hostile anti-union atmosphere in mind, I turn to Overnite’s campaign of promises and threats at the four service centers subject to the Gissel bargaining orders — Lawrenceville, Louisville, Norfolk, and Bridgeton.
2. Unit Specific Violations
a. Lawrenceville
A representation election was conducted at Overnite’s Lawrenceville, Georgia, service center in April 1995. The Union lost the election by only four votes, forty-two to thirty-eight, and it filed timely objections to Overnite’s preelection misconduct. The ALJ and the Board then found that Overnite had engaged in a series of unfair labor practices during the election campaign. For example, it restricted access to *451 bulletin boards that had previously been available for employee postings. Over-nite’s “purpose was to discourage the employees in their campaign[,]” and the ALJ concluded that Overnite had thereby violated § 8(a)(1) of the Act. Overnite, 329 N.L.R.B. at 34. The Board found a litany of anti-union activity by Overnite at Law-renceville, including:
• Lawrenceville manager Bill Carter “gave the impression to [an employee] that he was monitoring the union activities.” Id.
• Carter announced to a group of employees that he had attended a management conference, and that Over-nite, under Douglas’s management, was pursuing solutions to employee complaints regarding such issues as overtime policies and uniforms. The ALJ found that Carter’s statements “unlawfully promised benefits in order to discourage employees from supporting the [Union].” Id.
• Carter threatened to get rid of employees if they voted to be represented by the Union. Id. at 35. Indeed, he admitted telling two employees that he could have fired them for certain incidents; if they were to vote in the Union, he would not be as lenient. Id.
• An Atlanta manager, Roger Schager, conducted several mandatory meetings for the Lawrenceville employees at which he made illegal threats of closure and employee job loss. He projected that if Overnite had to operate under a Union contract, it would be forced to go out of business. He also warned that other trucking companies had not been able to survive unionization. Id.
• After screening an anti-union film at one such meeting, Schager reportedly told an employee: “[I]f you want a Union job why don’t you go and get a Union job with a company that is a Union company.” Id. at 36. On another occasion, he unlawfully offered to help employees get jobs with union carriers if they were dissatisfied with Overnite’s non-union status. Id.
• Schager also recounted the Chicago experience to a group of employees; Schager told them that the Chicago unit still did not have a contract after protracted negotiations, but he neglected to mention Overnite’s culpability. Id. As the ALJ observed, “[b]y Schager’s omission of any reference to the Board’s finding that Overnite bargained in bad faith, [Overnite] implied that bargaining would be futile, lasting for years without any possibility of agreement.” Id.
• Similarly, in March 1995, Lawrence-ville dispatcher Mike Rivers told a group of employees that union employees at the Kansas City service center had not received the March 5 pay raise. He added that, based on what the company’s lawyers had told him, Overnite would never sign a Union contract. Rivers asked the employees to look at what had happened at the Chicago service center, reminding them that the Chicago employees had been represented by the Union for ten to thirteen years and still did not have a contract. Like Schager, he advised Lawrenceville employees that all Over-nite had to do was bargain in good faith. Id. at 37.
• In late March, Overnite’s vice president of safety, Bobby Edwards, came to Lawrenceville and met with employees, speaking to them about Chicago in detail. Edwards told them that the Chicago employees had voted for Union representation and had been in negotiations with Overnite for about ten years but still did not have *452 a contract. Additionally, he emphasized that employees at those service centers that had voted for Union representation in 1994 and 1995 would not receive the March 1995 pay raise because the raise was subject to collective bargaining. Id.
• At another meeting, Edwards repeated the remarks about Chicago, adding that all Overnite had to do was negotiate in good faith. Edwards also announced that the employees at the service centers that had voted for Union representation before March 5 would not receive the pay raise because it was “on the negotiating table.” Id.
• While visiting the Lawrenceville service center, President Douglas suggested to employees that they serve on committees to come up with better ways to spend employee benefit funds. This, the ALJ found, “amounted to soliciting grievances from employees with a promise to redress them.” Id. at 38. Douglas further threatened “that management would change its attitude in the way it enforced its work rules” if the Union won. Id. Douglas advised one employee that if the Union’s campaign were successful, everything, including the employees’ jobs and benefits, would be jeopardized. Id.
b. Louisville
A coordinated Union organizing effort began at the Louisville service center in early October 1994. By late November, managers were soliciting employee grievances, in violation of § 8(a)(1) of the Act. A representation election was held in March 1995, and the Union lost by only two votes, eighty-five to eighty-three. The Board found that Overnite management, during the period leading to the representation election, engaged in numerous unlawful measures to alternately appease and threaten its Louisville employees. Over-nite’s anti-union conduct at Lawrenceville, as found by the Board, included the following:
• Louisville manager Dave Harmeier conducted a series of employee meetings, some impromptu and some mandatory, in which he promised to be responsive and encouraged employees to give Douglas’s “new vision” a chance. Id. at 39.
• Following this positive introduction, Douglas made a personal appearance at the Louisville service center a week before the scheduled election (about March 9 and 10). Douglas assured employees that he “was going to try and 'straighten stuff out,’ ” and he specifically mentioned the wage increase and improved benefits. The ALJ found that, in the context in which they were extended, Douglas’s promises were intended to dissuade employees from supporting the Union. Id.
• In tandem with these rosy promises, management “warned of the harm to employees that would result if the Union were successful.” Id. at 40. One supervisor warned employees that Ov-ernite would “play hardball” if the Union won, and that everyone would have to work harder. Id. Another supervisor projected that “we’d all be out of work” if the Union were voted in. In short, the ALJ found that Overnite “threaten[ed] employees with the loss of their jobs and more onerous working conditions if they selected the [Union] as their bargaining representative.” Id.
• At one mandatory meeting, Vice President Edwards reported that the Union had won in Chicago in 1984, and he falsely stated that Overnite had been *453 bargaining in good faith since then. Edwards added that all Overnite was obliged to do was offer five days’ sick leave and “that was bargaining in good faith.” Id. If the Union were voted in, he projected, “then that means that [the Union] would start from scratch.” Id. Edwards also said that at service centers that had voted in the Union, the pay raise would have to be negotiated, and if the Louisville employees voted in the Union, bargaining would be handled basically like negotiations in Chicago. Id.
• At another meeting, Edwards told the employees that the Chicago facility still did not have any kind of contract, and that it had been at least ten years since the employees voted the Union in. Id.
• Edwards discussed Chicago at yet another meeting, recounting how company representatives would show up, charges would be filed for bargaining in bad faith, Overnite would go to court and pay a small fíne, and then it would not have to show up again until the following year. Id.
• On several occasions, Edwards and Harmeier made predictions about unionization to employees assembled for mandatory meetings. Once, Edwards pointed out that the Louisville employees would be receiving the March pay increase, but terminals that had voted a union in, such as Kansas City, would not because they would have to negotiate first. Id. Another time, Edwards opined that the only way union employees would get a contract was to go on strike, and if they did, they could be replaced. Id. Har-meier also stated that the only leverage the Union had in bargaining was to call a strike, and warned that the Union could do so without a vote by the employees. Id.
• Louisville supervisors also took measures to impede the employees’ statutory right to distribute and read Union literature. The ALJ found that, on one occasion, a supervisor “literally pulled [Union] papers out of the hands of one employee who was reading it and threw it in the trash.” Id. at 41.
• On the Friday night before the election, an Overnite supervisor told an employee that Harmeier had instructed him to get rid of all Union literature during the last week of the campaign. Id. At about the same time, a “Teamsters Graveyard” poster was put up in the break room, depicting the gravestones of unionized trucking companies; among them was an Over-nite headstone with an open grave and a question mark. Id. at 21 n. 10.
c. Norfolk
The Union organizing campaign began at Óvernite’s Norfolk, Virginia, service center in January 1995, and a representation election was held in March 1995. The Union lost by a vote of fifty-eight to twenty-nine, and it objected to Overnite’s illegal pre-election conduct. As in Lawrenceville, the ALJ found that Overnite violated the Act by preventing its Norfolk employees from posting union literature on company bulletin boards that had been made available for the employees’ general use. Id. at 48. Norfolk manager Michael Mendenhall even threatened to fire employees for posting an NLRB form on one such bulletin board. Id. The ALJ found that Overnite engaged in a number of other anti-union practices leading up to the election at Norfolk, including:
• Supervisors told employees that, among the adverse consequences of voting in the Union, they would lose *454 the March 5, 1995, pay raise. Id. at 47-48.
• Mendenhall told employees that the good things Overnite had planned would be postponed because the company would have to divert the funds to keep Overnite non-union. Id. at 48. The ALJ further found that Menden-hall “gave some instructions about the way the union campaign was to be run,” informing employees that “he would not stand for any union literature on his bulletin board.” Id. (emphasis in original).
• In late February 1995, Mendenhall conducted a lengthy meeting attended by about twenty-five employees. He began the meeting by stating that the Union had filed a petition for an election and that any of the service centers that voted in the Union before March 5 would not receive the pay increase scheduled to take effect that day, because the increase could not be established in the 6525-49-1 absence of contract negotiations. He further remarked that the service center in Chicago had not settled on a contract after thirteen years of negotiations. Id.
• Mendenhall told employees that he would not tolerate conversations about the Union while they were working or at the workplace, and that if they did not comply with that policy, they had better be careful. Prior to the Union campaign, company policy was that employees could talk to one another as long as their conversation did not interfere with their jobs. Id. at 48-49 & n. 72.
• During the week following the February meeting, employee David Spaugh, an outspoken Union supporter, asked Mendenhall how long it would be before he would be fired if the Union lost the election. Mendenhall replied: “Everyone will be held accountable.” Id. at 49. On March 14, Mendenhall told Spaugh and fellow employee Rich Williams that Williams had become an “agitator.” Id. He warned that he did not want to see anything bad happen to either of them because of the Union campaign, and that they should be careful. Id.
• At various other mandatory meetings, Mendenhall made additional predictions about the consequences of unionization. For example, he repeated that the Kansas City employees would not be getting the March pay increase because they had voted the Union in. Id. at 47. He also boasted that in the thirteen years the Union had represented employees at the Chicago service center, there had never been a contract. If the Union were to prevail at Norfolk, he projected, the same scenario would play out in Norfolk: “Ov-ernite would negotiate in good faith, but the employees would never get further than their vote.” Id. at 50.
• At one or more of the meetings, Men-denhall also told the employees that if the terminal voted for Union representation, “business would be re-routed around them” and their hours might be cut. Id. As an example, he cited the experience at Kansas City, where “word was” that this was happening. Id.
• On several occasions, Mendenhall threatened employees with unspecified retaliation, letting them know that he “was not going to stand for insubordination.” Id. at 49. Moreover, he was found to have denied pro-union employees the same opportunities to speak at the mandatory meetings as anti-union employees, “cut[ting] short employees who made pro-union com *455 ments or asked questions for clarification.” Id. at 50.
• Management threatened employees with the loss of the company’s 401(k) pension plan. Id. at 49.
• In the weeks before the election, Norfolk supervisors gave “Vote No” hats to those employees who were going to vote against the Union, which the ALJ found to constitute interrogation of employees about their union sympathies. Id. at 49-50.
• In February, a supervisor told a group of eleven or twelve employees that if the Union were to win, they would lose their jobs. Moreover, if the Union were to strike, they would lose their jobs and Overnite probably would not call them back. Id. at 50. That same day, another supervisor told an employee that the employees were going to get a fifty-cent-per-hour raise, but if the Union were voted in, they would “lose it.” Id. at 47.
• On March 14, a supervisor told a Norfolk employee that he was “afraid” for himself and Overnite if the Union got in. He expressed his concern that Ov-ernite would not be able to pay the Union scale, and that the employees should look at the union companies that had gone out of business. Id. at 49.
• An employee complained that supervisors “ ‘watched [him] like a hawk’ and stayed within listening distance.” Id. at 50. The ALJ determined that not only did supervisors create an impression of surveillance, but that “there was actual surveillance and monitoring in violation of Section 8(a)(1) of the Act.” Id.
• The former Norfolk manager was sent to assist with the anti-union campaign. The ALJ found that he unlawfully “told employees that Douglas was working on improvements of the workplace and benefits, which was an implied promise of those improvements; impliedly promised the termination of the [terminal manager], if that would change employees’ pro-union sympathies; and informed employees that strikes were inevitable.” Id. at 51.
d. Bridgeton
The Union began an organizing campaign when Overnite opened a new service center in Bridgeton, Missouri, in December 1994. A representation election was held on February 28, 1995, and the Union lost by only two votes, twenty-four to twenty-two. It then filed objections to Overnite’s pre-election misconduct. In January 1995, Bridgeton manager Walter Grimes began illegally monitoring one of the most steadfastly pro-Union drivers— “even checking the bathroom” — to ensure that he was not engaging in organizational activities. Id. at 53. Along with illegal monitoring, the ALJ found numerous other preelection violations by Overnite, including:
• Grimes removed union literature posted on the company bulletin board, left on tables in the break room and in the employee bathroom. While removing the pro-Union literature, the manager allegedly remarked that he “[didn’t] like to see that shit hanging on his board.” Id.
• In January and February, local supervisors stifled conversations between Union supporters and other employees. On the other hand, conversations between anti-union employees and others were left undisturbed. Around the same time, Grimes asked a union supporter what the employees wanted. When that employee said overtime and better benefits, Grimes responded: “They are in the works.” Id. at 54.
*456 • Overnite’s “troubleshooters” arrived in the Bridgeton-St. Louis area around February 5 and stayed until February 14, riding with all the drivers except the two most active union supporters. Id. at 53.
• One such troubleshooter, Andy Hamilton, told a driver that Overnite wanted to make its employees happy, accommodating them by improving benefits and inviting more employee input. After the driver mentioned that overtime would make the company a better place to work, Hamilton assured him that it was in the works. Hamilton also told the employee that he would look into the idea of an employee committee that would participate in selecting the benefit package, but advised him that “we don’t need a third party at Overnite.” Id. at 53-54. When another employee made similar suggestions about benefits and overtime pay, Hamilton told him those things were in the works. Id. at 54 n. 83.
• During the pre-election period, Over-nite sent the former Bridgeton Manager Jeff Woods, Operations Director Morgan, and President Douglas to speak to the Bridgeton employees. In February, Woods told employees that Overnite was looking into overtime and, although he could not make any promises, he was “pretty sure” it was going to happen and that it was “almost a sure thing ... almost a done deal.” Id. at 54. Woods warned that the Union “would not work within the Overnite environment” and that, as a result, the benefit improvements Over-nite was trying to make would be lost. Finally, just a week before the election, he urged employees to give the new management a chance. Id.
• About two weeks before the election, Operations Director Morgan spoke at a mandatory meeting of about fifteen employees. He responded to questions about overtime pay by telling them that Douglas had taken over as president and, although he could not promise them anything because of the Union campaign, Douglas was looking into these problems and devising solutions. Id. On the same day, Morgan informed a group of employees that it was not too late to come up with nonunion solutions to employee grievances. When one employee remarked that other companies had better wages and benefits, but that Overnite’s profits were higher, Morgan replied that these were the sorts of problems that they needed to present to Douglas, and that they ought to give Jim a chance. Id. at 55.
• President Douglas made several visits to Bridgeton prior to the election, speaking with employees about benefits, including overtime pay. During one such conversation, Douglas queried, ‘What if we gave you overtime at say, over 45, 48 hours, but we maybe lessen [overall workload],” adding that they were looking into medical benefits. Douglas proceeded to discuss the pros and cons of overtime pay. Id. at 54.
• Two weeks before the election, Douglas held a meeting with about twenty to twenty-five employees. He announced that he wanted to know what was on their minds, and that he was trying to change things for the better. In response to employee questions about matters such as overtime, uniforms, sick days, and medical benefits, Douglas assured employees that he was looking into such matters. The company, Douglas asserted, could take care of its own and did not need third party interference. Id. at 55.
*457 3.
As the Board found, Overnite was engaged, over an extended period of time, in an ongoing national effort, characterized by unlawful anti-union activity, against the Teamsters. Simultaneously, Overnite pursued “highly coercive ‘carrot and stick’ campaignfs]” at Lawrencevflle, Louisville, Norfolk, and Bridgeton. Id. at 3. Overnite repeatedly solicited employee grievances with express or implied promises to remedy them. It consistently reminded its workers that unionized employees would not receive the March 1995 wage increase, but would instead have to wait for negotiations. The frustrated negotiations in Chicago were repeatedly invoked to remind employees of Overnite’s aversion to unionization. Overnite supervisors asserted that unionization would cause Overnite to lose customers, go out of business and “shut the doors,” and that the Union would jeopardize “jobs, ... benefits — everything.” Id. at 4. Additionally, Overnite’s management made multiple threats against the Union, including loss of benefits, imposition of stricter discipline and work rules, along with more onerous working conditions. Overnite also engaged in an unlawful crackdown on union activities at each of the four service centers, including threats of retaliation, unlawful surveillance of union activities, the stifling of conversations among pro-union employees, and unlawful restrictions on the use of company bulletin boards.
4.
The en banc majority does not dispute that Overnite was guilty of this litany of unfair labor practices, and it readily concedes that Overnite’s misconduct dissipated the Union’s majority at the Lawrence-ville, Louisville, Norfolk, and Bridgeton service centers. Ante at 436. However, again ignoring the deference the Board is
due, the majority concludes that Overnite’s conduct did not warrant the Gissel bargaining orders. It chooses to focus on four asserted “mitigating factors” to support its position: (a) Overnite’s lack of continuing misconduct; (b) the rate of employee turnover; (c) the passage of time; and (d) that fair elections were held at other Overnite service centers. As explained below, the majority’s reliance on these factors is misplaced.
a.
First of all, the majority maintains that Overnite’s unfair labor practices ceased in mid-1995. To the contrary, there is ample evidence that Overnite continued to engage in severe and pervasive violations of the Act in 1996 and 1997, after Overnite and the Union had partially settled their differences in July 1995. The following examples support this point:
• In December 1995, Overnite circumvented the Union and proposed its annual wage increase, coupled with a productivity agreement, directly to the unionized employees. By its supervisor’s own admission, Overnite intentionally sought to avoid bargaining with the Union about the wage increase and productivity agreement.
• In spite of the fact that Overnite had a six-teen year practice of awarding annual wage increases to its employees, it awarded the January 1996 wage increase in a discriminatory manner, to non-union employees only.
• Following its discriminatory January 1996 wage increase, Overnite flaunted its conduct by distributing anti-union campaign flyers asserting that non-union employees were being paid more than union employees, and further contending that “voting for the Teamsters presented serious, adverse conse *458 quences.” Overnite, 329 N.L.R.B. at 60.
• In preparation for the hearing before the ALJ in May 1996, Overnite’s attorneys engaged in coercive questioning of employees at the Louisville service center.
• In 1997 Overnite again publicized its wage discrimination against the union employees. ■ As the ALJ explained, “[additional flyers, apparently issued after Respondent increased wages in 1997, called attention to the fact that the non-union employees earned 95 cents more than those represented by the Teamsters.” Id. at 60 n. 103 (emphasis added).
In sum, this voluminous record contains unequivocal evidence to support the Board’s finding that, well after the partial settlement, Overnite continued its anti-union activities and engaged in additional violations of the Act.
b.
The majority’s second basis for refusing to enforce the Gissel bargaining orders is that the Board failed to properly consider the rate of employee turnover occurring after the original elections. In point of fact, however, the Board did consider the issue of employee turnover, and it specifically found that “[i]n the present case, even accepting, arguendo, the facts asserted by [Overnite] concerning employee turnover, we find the effects of [Ovemite’s] unlawful conduct are not likely to be sufficiently dissipated by turnover to ensure a free second election.” Overnite, 329 N.L.R.B. at 5 (emphasis added). The Board went on to explain that the employee turnover rate did not undermine the Gissel bargaining orders, observing that a substantial majority of employees continued to be employed by Overnite, and that they would recall its coercive and impermissible actions.[4] Id.
Under applicable law, there is no specific threshold rate of employee turnover that renders a Gissel bargaining order impermissible. Moreover, if such a threshold rate existed, it would not be implicated in this case. When the bargaining orders were issued, between sixty and seventy percent of the Overnite employees who were exposed to its earlier campaign of unfair labor practices continued to work at the four service centers. And the courts have frequently upheld Gissel bargaining orders in the face of higher turnover rates. For example, in NLRB v. So-Lo Foods, 985 F.2d 123, 128-29 (4th Cir.1992), we upheld a bargaining order in which the turnover rate was seventy-three percent. See also Amazing Stores, Inc. v. NLRB, 887 F.2d 328, 330-31 (D.C.Cir.1989) (upholding bargaining order despite ninety-five percent turnover); NLRB v. Gordon, 792 F.2d 29, 34 (2d Cir.1986) (enforcing bargaining order after one-hundred percent turnover); Action Auto Stores, Inc., 298 N.L.R.B. 875 (1990), enforced 951 F.2d 349 (6th Cir.1991) (issuing bargaining or *459 der where there was seventy-five percent turnover).
Although, not unexpectedly, there was some turnover of employees at the four service centers, the Board carefully assessed this factor in light of Overnite’s overall anti-union conduct. It then determined that, based on the record and its expertise, the Gissel bargaining orders should issue. As such, the majority’s attribution of error to the Board on the factor of employee turnover is misplaced.
c.
The majority also places emphasis on the asserted “passage of time” between Overnite’s unfair labor practices and the Gissel bargaining orders, concluding that there was nearly a five-year gap. The majority’s analysis, however, which is premised on its conclusion that Overnite’s anti-union activity ended in July 1995, is flawed. In fact, Overnite engaged in unfair labor practices in late 1995 and early 1996 when it (1) circumvented the Union; (2) awarded its discriminatory wage increase to non-union employees only; and (3) distributed campaign flyers blaming its discriminatory conduct on the Union. Furthermore, the ALJ found that this coercive behavior continued in 1997 when Overnite circulated additional flyers calling attention to the fact that “non-union employees earned 95 cents more than those represented by the Teamsters.” Overnite, 329 N.L.R.B. at 60 n. 103. The very next year, in April 1998, the ALJ issued its Decision detailing Overnite’s anti-union activity and recommending issuance of Gissel bargaining orders. By that time, the ALJ had conducted its evidentiary hearing in this complex case, and it had reviewed thousands of pages of exhibits and more than 14,000 pages of hearing transcripts. Id. at 6. In these circumstances, the passage of a single year’s time is hardly excessive. Moreover, if we were to compute the passage of time based on the date of the Board’s Decision and Order (November 1999), rather than the ALJ’s Decision, the lapse (from 1997 to November 1999) would be less than three years.
As with the employee turnover rate, there is no threshold time lapse after which issuance of a Gissel bargaining order by the Board is legally impermissible. Any undue lapse of time is simply another factor for the Board to consider in applying its expertise. It is true, of course, that in some circumstances, a time lapse may be sufficient to preclude a fair election. See Be-Lo v. NLRB, 126 F.3d 268, 282 (4th Cir.1997) (“It strains credulity to believe that Be Lo’s unfair labor practices, such as they were, had such long-lasting effects that a fair rerun election could not have been held four years later-”). However, the courts have routinely enforced bargaining orders involving time lapses longer than the one in this case. For instance, in So-Lo Foods, we enforced a Gissel bargaining order issued three- and-a-half years after assertion of the unfair labor practices. So-Lo Foods, Inc., 303 N.L.R.B. 749, 750 (1991), enforced, 985 F.2d 123 (4th Cir.1992). See also NLRB v. Intersweet, Inc., 125 F.3d 1064, 1068 (7th Cir.1997) (explaining that period of “just over three years ... between the time of the violations and the imposition of the Gissel order” did not render bargaining order unenforceable because it was “ordinary institutional time lapse[ ] inherent in the legal process”) (internal quotations and citations omitted). In light of Overnite’s anti-union activities and the other relevant aspects of this case, the Board reasonably found that the time lapse did “not approach the time found to render the Gissel orders stale in some cases.” Overnite, 329 N.L.R.B. at 6.
*460 d.
The majority’s final point , in justifying its view on the bargaining orders is that “fair reelections were found to have been conducted at several other sites which were similarly influenced by Overnite’s unfair labor practices.” Ante at 438. Significantly, both the Board and the ALJ also fully considered this factor; they nevertheless concluded that, in the circumstances, Gissel bargaining orders were warranted at Lawrenceville, Louisville, Norfolk, and Bridgeton. Overnite, 329 N.L.R.B. at 6 n. 26, 63. Reviewing the Board’s choice of remedy for abuse of discretion, as we must, I entirely agree with the Board.
The Union’s ability to prevail in isolated elections at other facilities does not mean that fair elections would occur at Law-renceville, Louisville, Norfolk, and Bridge-ton. In point of fact, we do not know why employees at the other facilities voted for the Union. We could speculate (although it is improper to do so): perhaps the unfair labor practices at those locations were not as severe as these, or perhaps a distinct set of employee concerns propelled the Union to success. Put simply, a myriad of factors could explain why the Union succeeded at the other service centers.
Our job is not to guess what might have occurred at the other service centers. Instead, our task is to review the extent and impact of the unfair labor practices that occurred at Lawrenceville, Louisville, Norfolk, and Bridgeton, and then to assess, under the applicable legal principles, the propriety of the Gissel bargaining orders. The litany of anti-union activity at those four locations, recounted supra at 450-457, coupled with Overnite’s national violations of the Act, provide ample support for their issuance.
5.
In addition to maintaining that fair elections were possible at Lawrenceville, Louisville, Norfolk, and Bridgeton, the majority faults the Board for having insufficiently detailed its findings in support of the Gissel bargaining orders. We have indicated that when the Board issues Gis-sel bargaining orders it must make a “ ‘detailed analysis’ of the ‘continuing effect of misconduct, and the potential effectiveness of ordinary remedies....’” Be-Lo, 126 F.3d at 282 (quoting NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 997 (4th Cir.1979)). The rationale underlying this directive is that, in order to enable us to assess whether a bargaining order is warranted, the Board must provide us with an adequate record.
And in this case, the record is more than adequate. The Board carefully analyzed Overnite’s continuing misconduct and the relevant related factors, and it also considered the inadequacy of ordinary available remedies. It then issued its Decision and Order reiterating the meticulous and exhaustive Decision of the ALJ. In so doing, the Board observed that “[b]ecause this case falls within category II, we have, as mandated by the Supreme Court in Gissel, examined the extensiveness of the Respondent’s unfair labor practices and the likelihood of their recurrence in the future.” Overnite, 329 N.L.R.B. at 2. By way of example, the Board thoroughly examined the “compliance program” which Overnite had supposedly instituted to avoid future unfair labor practices, and it determined that Overnite’s compliance program had been a failure. Id. at 4. The Board also made specific findings that (1) Overnite had engaged in severe and pervasive hallmark violations of the Act, (2) the violations could not be remedied, and (3) the violations would not be dissipated by employee turnover. Id. at 5-6. Thus, in *461 issuing its Gissel bargaining orders, the Board carefully assessed the likelihood of recurring unfair labor practices and the efficacy of ordinary remedies. As such, it has provided us with a detailed record for our review and assessment of its Gissel bargaining orders.
The Supreme Court’s unanimous decision in Gissel clearly articulated the role of bargaining orders in remedying unlawful election activity, and in deterring future anti-union misconduct. As the Court observed:
If an employer has succeeded in undermining a union’s strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer’s unlawful campaign.
Gissel, 395 U.S. at 612, 89 S.Ct. 1918.
This very proceeding presents the scenario envisioned by the Court in Gissel. Faced with Overnite’s egregious violations of the Act, the Board concluded that bargaining orders were warranted at the four contested service centers, and it issued them. Informed as it was by the Board’s unique expertise and by the exhaustive findings of the ALJ, the Board’s Order was entirely appropriate, and we should enforce it.
I respectfully dissent, and I am pleased to state that Judge Michael and Judge Motz concur in this dissenting opinion.

. Because I would uphold the Board’s findings on the unfair labor practices engaged in by Overnite, and because I would enforce each of its Gissel bargaining orders, I adhere to the views expressed in the opinion of the panel majority in this appeal. Overnite Transp. Co. v. NLRB, 240 F.3d 325 (4th Cir.2001).

. Section 8 of the Act sets forth the statutory definitions of the unfair labor practices in this case, providing in pertinent part as follows: It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights [to engage in union activities] ...;
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;
(5) to refuse to bargain collectively with the representatives of his employees....
29 U.S.C. § 158.

. In this opinion, I generally refer to the findings of the Board and the ALJ interchangeably, except as otherwise noted, because the Board, in its Decision and Order of November 10, 1999, affirmed the findings made by the ALJ in his Decision of April 10, 1998. See Overnite, 329 N.L.R.B. at 1 (“The Board has ... decided to affirm the [ALJ’s] rulings, findings, and conclusions as modified. ...).

. The majority asserts that the Board's conclusion on turnover impermissibly relied on what is called the "lore of the shop,” i.e., employees’ tales of past employer misconduct, and therefore it did not adequately consider the turnover issue. Ante at 437 n. 4. The Board, however, made clear that it relied on factors other than the "lore of the shop” in reaching its conclusion that employee turnover failed to mitigate Overnite's misconduct. In fact, while specifically rejecting the concept of "lore of the shop” as speculative, Board Member Hurtgen concurred with the majority that the turnover rate was not a sufficiently mitigating factor. Member Hurt-gen instead noted that the disparity in treatment between union and non-union employees at Ovemite, e.g., with respect to wages, was sufficient to render the turnover rate inconsequential. Overnite, 329 N.L.R.B. at 5 n. 25.